## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CLOUMBIA

_____

|  |  |  |
|---|---|---|
| **MYSTERY PRODUCTIONS ENTERTAINMENT, LLC, T/A CLUB RENDEZOUS** 2840 Alabama Ave, S.E. Washington, DC 20020 | : : : : : : : | |
| Plaintiff, | : : | Case No.: |
| v. | : : | |
| **DISTRICT OF COLUMBIA GOVERNMENT** John A. Wilson Building 1350 Pennsylvania Avenue, NW Washington, DC 20004 | : : : : : : | |
| Defendant. | : | |

_____:

### PLAINTIFF'S MOTION AGAINST THE DISTRICT OF COLUMBIA GOVERNMENT FOR A PRELIMINARY AND PERMANENT INJUNCTION

COMES NOW, Plaintiff, by and through counsel Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C., and hereby presents Plaintiff's Motion seeking a declaration that DC Official Code §25-374 (2001) is unconstitutional under the First and Fourteenth Amendments; seeking a preliminary and permanent order enjoining the Defendants, their officers, agents, servants, attorneys, and all persons in active concert or participation with Defendants, who receive actual notice of the injunction by personal service; and seeking the cost of litigation. The Plaintiff asks that this Court schedule a hearing on the instant matter as soon as this Court's calendar permits. Plaintiff will suffer irreparable harm if this court does not act. Plaintiff's position is set forth in the accompanying memorandum of points and authorities.

Respectfully submitted,

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623 (Fax)
Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CLOUMBIA**

_____
                                                    :
**MYSTERY PRODUCTIONS**                              :
**ENTERTAINMENT, LLC,**                              :
**T/A CLUB RENDEZOUS**                               :
**2840 Alabama Ave, S.E.**                           :
**Washington, DC 20020**                             :
                                                    :
                                                    :
        Plaintiff,                                  :          Case No.:
                                                    :
v.                                                  :
                                                    :
**DISTRICT OF COLUMBIA**                             :
**GOVERNMENT**                                       :
**John A. Wilson Building**                          :
**1350 Pennsylvania Avenue, NW**                     :
**Washington, DC 20004**                             :
                                                    :
        Defendant.                                  :
_____:

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**</u>
<u>**PLAINTIFF'S MOTION AGAINST THE DISTRICT OF COLUMBIA**</u>
<u>**GOVERNMENT FOR A**</u>
<u>**PRELIMINARY AND PERMANENT INJUNCTION**</u>

COMES NOW, Plaintiff, by and through counsel Jimmy A. Bell, Esq. and the

Law Office of Jimmy A. Bell, P.C., and hereby presents this Memorandum of Points and

Authorities in support of Plaintiff's Motion seeking a declaration that DC Official Code

§25-374 (2001) is unconstitutional under the First and Fourteenth Amendments; seeking

a preliminary and permanent order enjoining the Defendants, their officers, agents,

servants, attorneys, and all persons in active concert or participation with Defendants,

who receive actual notice of the injunction by personal service; and seeking the cost of

litigation.  The Plaintiff asks that this Court schedule a hearing on the instant matter as

soon as this Court's calendar permits. Plaintiff will suffer irreparable harm if this court does not act.

## STATEMENT OF FACTS

Warren Whitehead, is the owner of Mystery Productions Entertainment, LLC, t/a Club Rendezvous at 2840 Alabama Avenue, S.E., Washington, DC 20020. There has been city authorized nude dancing at that location since 1992.  The club holds a  Class "CN" retailer's license where nude dancing is permitted. This particular area where the club is located underwent eminent domain by the District of Columbia Government. Plaintiff was notied notified by D.C. Government Officials that the government plans to enforce DC Official Code §25-374 (2001), a zoning ordnance, against his club. The alleged purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. The possible locations in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing may file an application to transfer its license are contained in DC Official Code §25-374 (2001).  This provision states in relevant part as follows:

> "A license under §25-371(b) may only be transferred to a location in the Central Business District or if the licensee is currently located in a CM or M-zoned district, <u>transferred within the same CM or M-zoned district</u> as identified in the zoning regulations of the District of Columbia and shown in the official atlases of the Zoning Commission of the District of Columbia . . ." (Emphasis added).

Because of DC Official Code §25-374 (2001), there is only one location where plaintiff can move, if a location was available, the central business district of the city. In real terms, the government enforcing DC Official Code §25-374 (2001) against plaintiff

means he will be out put out of business for one reason, because he has nude dancing. This law only applies to adult entertainment establishments. The statute does not apply to bars, nightclubs, hip-hop clubs, a liquor stores and/or clubs that plays go-go music. They can move anywhere in the city but plaintiff cannot because his license (issued by the government) allows for non-obscene nude dance performances.

Additionally, whether DC Official Code §25-374 (2001) provisions allows the holder of a Class "CN" retailer's license with nude dancing, currently located in a CM or M-zoned district, to file an application to relocate its license to an equivalent CM or M-zoned district in another part of the District of Columbia depends upon the proper interpretation of the word "same" in the phrase "transferred within the same CM or M-zoned district."  There is no specific legislative history regarding DC Official Code §25-374 (2001) in the Draft Report on Bill 13-449, the Title 25, DC Code Enactment and Related Amendments Act of 2000, which was later enacted by the Council as part of DC Law 13-298, effective May 3, 2001.

When you examine the plain meaning of the statute that there are two possible interpretations of the word "same" as used in this phrase. First, the phrase "transferred within the same CM or M-zoned district" can be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing only within the specific boundaries of the particular CM or M-zoned district in which it is currently located.  Under this interpretation, the holder of a Class "CN" retailer's license with nude dancing would be prohibited from filing a license application to move its license from its existing CM or M-zoned district to an identical CM or M-zoned district in another part of the District of Columbia.

The phrase "transferred within the same CM or M-zoned district" can also be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing from its existing CM or M-zoned district to an identical or equivalent CM or M-zoned district in another part of the District of Columbia. Specifically, under this interpretation, the holder of a Class "CN" retailer's license located in a CM-1, CM-2, CM-3, or M-zoned district, as defined in Section 105.1 of Title 11 of the DCMR (Zoning Regulations) and contained in the zoning maps of the District of Columbia, would be allowed to file an application to transfer its license respectively to another CM-1, CM-2, CM-3, or M-zoned district. For example, the holder of a Class "CN" retailer's license with nude dancing approved by the Board to be located in a CM-2 zoned district would be permitted to file an application to transfer its license to another CM-2 zoned district located in another part of the District of Columbia.

This is not a hypothetical situation. The Alcoholic Beverage Regulation Administration Board were faced with these two interpretations on February 28, 2007 In The Matter of Capitol Hill Cabaret, Inc. t/a Edge/Wet Case No. 61162-07/010P and split the vote 3 – 3, an equal number for both interpretations, so it is unconstitutionally vague and must be struck down. (Exhibit 1)

## **STANDING**

Plaintiff brings a Constitutional challenge against DC OFFICIAL CODE §25-374 (2001) on overbreadth grounds and other state and federal constitutional violations. The overbreadth doctrine is "a departure from traditional rules of standing." Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). Under this doctrine, a Plaintiff may "challenge a statute on its face because it also threatens others not before the court -- those who desire

to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Board of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (internal quotations and citation omitted). Here, the overbreadth doctrine allows Plaintiff to assert the First and Fourteenth Amendment rights of those who do wish to "present or act" in Constitutionally protected speech, even if Plaintiff here does not. See, e.g., Deja Vu of Nashville, Inc. v. Metro. Gov't, 274 F.3d 377, 387 (6th Cir. 2001). In the event that an overbreadth challenge is successful, "any enforcement" of the regulation at issue is "totally forbidden." Broadrick, 413 U.S. at 613.

The Plaintiff is not required to demonstrate that its conduct is expressive before bringing an overbreadth challenge. The Supreme Court has expressly rejected this position by stating that, "It is well established that in the area of freedom of expression an overbroad regulation may be subjected to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." Forsyth County v. Nationalist Movement, 505 U.S. 123, 129 (1992) (citing City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798-99 (1984); Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987)). The Court went further to state that, "This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." Id. The Supreme Court has expressly allowed a party to challenge a law, like PG-300, "in cases where the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." Id. at 130; see generally Watchtower Bible & Tract Soc'y of New York, Inc.

v. Village of Stratton, 536 U.S. 150 (2002) (reversing and remanding for further proceedings where the Sixth Circuit rejected the argument that the law at issue was overbroad, but neither commenting on, stating, nor limiting the overbreadth doctrine to challenges based on a showing of expressive activity); City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 755-56 (1988) (citing, Freedman v. Maryland, 380 U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, *whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he had applied for a license*") (emphasis original)); Board of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (stating the overbreadth doctrine, but never mentioning a requirement that the challenger's conduct be expressive); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153 (1969) (holding that a law granting unlimited authority to grant or withhold parade permits would be unconstitutional on its face, but not limiting overbreadth challenges to those plaintiff's who first demonstrate that their conduct is expressive).

As the Supreme Court has not so limited the overbreadth doctrine and long standing precedents makes it expressly clear that the overbreadth doctrine allows the Plaintiff to facially challenge an overbroad regulation "even though its application in the case under consideration may be constitutionally unobjectionable," Nationalist Movement, 505 U.S. at 129 (citing City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798-99 (1984); Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987)), the Plaintiff has standing to bring an overbreadth challenge.

Plaintiff's harm is also imminent. The constitutional requirement of standing has three elements: (1) "injury in fact," which is "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical"; (2) "causation," a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"; and (3) "redressibility," a "likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (internal citations and quotations omitted). Though the party asserting jurisdiction, here plaintiffs, always carries the burden of demonstrating constitutional standing, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990). Here Plaintiff states in a declaration:

> I, Warren Whitehead, am over 18 years of age, and I am the owner of Mystery Productions Entertainment, LLC, t/a Club Rendezvous at 2840 Alabama Avenue, S.E., Washington, DC 20020, declare as follows:
>
> I have direct personal knowledge of the facts stated herein and would be competent to testify to same at trial.
>
> I am a holder of a Class "CN" retailer's license where nude dancing is permitted. This particular area where my club is located underwent eminent domain by the District of Columbia Government. I have been notified by D.C. Government Officials that the government plans to enforce DC Official Code §25-374 (2001), a zoning ordnance, against me. The alleged purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. Because of DC Official Code §25-374 (2001), there is only one location where I can move, if a location was available, and that is the central business district of the city. In real terms, the government enforcing DC Official Code §25-374 (2001) against my club means I will be out put out of business for one reason, because I have nude dancing. This law only applies to adult entertainment establishments.
>
> I am forced to leave an area that the club has been located in since 1992. I am in a predicament not of my own making. Simply because my license permits nude dancing, I am being treated differently, disadvantaged and not equal to a bar, nightclub, hip-hop club, a liquor store and/or a club that plays go-go music. They can move anywhere in the city but I cannot because my license (issued by the government) allows for non-obscene

nude dance performances. This situation was created by the government not my actions.

I declare under penalty of perjury that the foregoing is true and correct. (Exhibit 2)

## ARGUMENT

The issuance of a preliminary injunction requires consideration of four factors: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Mova Pharm. Corp. v. Shalala*, 329 U.S. App. D.C. 341, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 313 U.S. App. D.C. 178, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 64 (D.D.C. 2000). It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler*, 505 U.S. 1084, 1085, 120 L. Ed. 2d 926, 112 S. Ct. 2929 (1992) (per curiam). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted). The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. *CSX Transportation, Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747. Here, all of these factors tip the balance in favor of the Plaintiff.

Plaintiff seeks a preliminary injunction against the District of Columbia Government enjoining enforcement of DC OFFICIAL CODE §25-374 (2001) because the government has told plaintiff they intend to enforce the statue against his club only because he has nude dancing.

I.    **THERE IS A SUBSTANTIAL LIKELIHOOD THAT PLAINTIFF WILL SUCCEED ON THE MERITS OF ITS CLAIM BECAUSE DC OFFICIAL CODE §25-374 (2001) IS UNCONSTITUTIONALLY OVERBROAD ON ITS FACE.**

In analyzing whether or not DC OFFICIAL CODE §25-374 (2001)is fatally overbroad, this court must determine whether DC OFFICIAL CODE §25-374 (2001)adversely affects a "substantial" amount of protected speech relative to their legislative sweep. Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). The "appropriate focus" of this inquiry is not the actual intent of the enacting legislature. Barnes v. Glen Theatre Inc., 501 U.S. 560, 582 (1991) (Souter, J., concurring). Rather, in determining whether restrictions advance an important interest, a court asks only whether the government proffers evidence that the regulation serves "a *current* governmental interest." Id (emphasis added); see also Essence, Inc. v. City of Federal Heights, 285 F.3d 1272, 1284-85 (10th Cir. 2002); Jake's, Ltd. v. City of Coates, 284 F.3d 884, 888 (8th Cir. 2002); J & B Entm't, Inc. v. City of Jackson, 152 F.3d 362, 371-72 (5th Cir. 1998); Phillips v. Borough of Keyport, 107 F.3d 164, 178 (3d Cir. 1997).

However, here, the legislative history  neither references the proscribed activity, nor does it discuss its production of harmful primary or secondary effects. When activity is restricted without such a basis, its restriction is an impermissible application of the law. A law must be invalidated for overbreadth if it reaches a substantial number of

impermissible applications.  New York v. Ferber, 458 U.S. 747, 771 (1982).  As a result, to prevail, Plaintiff must demonstrate that a regulation's overbreadth is "not only… real, but substantial as well, judged in relation to the [challenged regulation's] plainly legitimate sweep."  Broadrick, 413 U.S. at 613, 615.

While the State may have a legitimate interest in improving the quality of life, increasing property values, and reducing crime in Prince George's County, there is no reason it cannot further these interests without such broadly drawn restrictions.  See United States v. Morrison, 844 F.2d 1057, 1075-76 (4th Cir.1988) (internal quotation marks and citation omitted) (noting that a court considers whether a state's legitimate interest "could be achieved by a less drastic means,--that is, a method less invasive of free speech interests").

Here, the District of Columbia Government has produced no evidence - either current or otherwise - of harmful secondary effects in from Plaintiff's establishment. They reach a great deal of expression in the heartland of the First Amendment's protection. As a result the court must find that, DC OFFICIAL CODE §25-374 (2001) adversely affects a substantial amount of protected speech and is therefore unconstitutionally overbroad and must be enjoined.

Additionally, whether DC Official Code §25-374 (2001) provisions allows the holder of a Class "CN" retailer's license with nude dancing, currently located in a CM or M-zoned district, to file an application to relocate its license to an equivalent CM or M-zoned district in another part of the District of Columbia depends upon the proper interpretation of the word "same" in the phrase "transferred within the same CM or M-zoned district."  There is no specific legislative history regarding DC Official Code §25-

10

374 (2001) in the Draft Report on Bill 13-449, the Title 25, DC Code Enactment and Related Amendments Act of 2000, which was later enacted by the Council as part of DC Law 13-298, effective May 3, 2001.

When you examine the plain meaning of the statute that there are two possible interpretations of the word "same" as used in this phrase. First, the phrase "transferred within the same CM or M-zoned district" can be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing only within the specific boundaries of the particular CM or M-zoned district in which it is currently located.  Under this interpretation, the holder of a Class "CN" retailer's license with nude dancing would be prohibited from filing a license application to move its license from its existing CM or M-zoned district to an identical CM or M-zoned district in another part of the District of Columbia.

The phrase "transferred within the same CM or M-zoned district" can also be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing from its existing CM or M-zoned district to an identical or equivalent CM or M-zoned district in another part of the District of Columbia.  Specifically, under this interpretation, the holder of a Class "CN" retailer's license located in a CM-1, CM-2, CM-3, or M-zoned district, as defined in Section 105.1 of Title 11 of the DCMR (Zoning Regulations) and contained in the zoning maps of the District of Columbia, would be allowed to file an application to transfer its license respectively to another CM-1, CM-2, CM-3, or M-zoned district.  For example, the holder of a Class "CN" retailer's license with nude dancing approved by the Board to be

located in a CM-2 zoned district would be permitted to file an application to transfer its

license to another CM-2 zoned district located in another part of the District of Columbia.

This is not a hypothetical situation. The Alcoholic Beverage Regulation

Administration Board were faced with these two interpretations on February 28, 2007 In

The Matter of Capitol Hill Cabaret, Inc. t/a Edge/Wet Case No. 61162-07/010P and split

the vote 3 – 3, an equal number for both interpretations, so it is unconstitutionally vague

and must be struck down. (Exhibit 1)

      **A.**      **DC OFFICIAL CODE §25-374 (2001) is Discriminatory and Unconstitutional Under the Fourteenth Amendment Because it Lacks a Rational Basis for Discriminating Between Clubs that has nude dancing and clubs that do not.**

The legislative record for DC OFFICIAL CODE §25-374 (2001) is devoid of any

indication of negative secondary effects.  So, the regulation of the activity is not

rationally related to the regulation of any negative secondary effects. Yet and still, the

plaintiff  is subject to being sanctioned for engaging in activity proscribed by DC

OFFICIAL CODE §25-374 (2001), but which is otherwise constitutionally protected.

There can be no rational reason for a law that imposes such a burden on Plaintiff,

yet spares bars, nightclubs, hip-hop clubs, a liquor stores and/or  clubs that plays violent

go-go music. They can move anywhere in the city but plaintiff cannot because his license

(issued by the government) allows for non-obscene nude dance performances.

The government gives no explanation as to why such a distinction is made.  With

regard to the primary or secondary effects on the community, nothing on the legislative

record describes any material differences between bars, nightclubs, hip-hop clubs, a

liquor stores and/or  clubs that plays go-go music and plaintiff.  In fact, there is no

evidence on the record at all that there are any negative secondary effects, and no analysis of the establishments in District of Columbia that offers nude dancing and the bars, nightclubs, hip-hop clubs, a liquor stores and/or clubs that plays violent go-go music.

The burden is on the government to show that the *discrimination* is demonstrably justified. U.S. CONST. amend. IV. When such attempted classification is arbitrary and unreasonable, the court must declare it beyond the authority of the legislature. Jeffrey Mfg. Co. v. Blagg, 235 U.S. 571 (1914). As discussed, *supra*, there is no discussion, analysis, or even mention of material differences on the legislative record. As a result, by imposing restrictions on one class of establishments and not another without any showing of real differences between them, DC OFFICIAL CODE §25-374 (2001) is arbitrarily discriminatory and must be struck down the Federal Equal Protection Clause.

**B.    DC OFFICIAL CODE §25-374 (2001) Imposes Restrictions on Free Speech Activity and  is Therefore Unconstitutional.**

The First Amendment bars the government from "abridging the freedom of speech" or "from dictating what we see or read or speak or hear." U.S. Const. amend. I; Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002). The Constitution not only protects "political and ideological speech," but also "live entertainment," including "nude dancing" and other performances involving nudity or other sexual elements. Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 65-66 (1981) (citations omitted); see also Ashcroft, 535 U.S. 248. Although these performances might offend some citizens, preservation of the critical right of free speech is one of the Constitution's most "fundamental personal rights and liberties," Gitlow v. New York, 268 U.S. 652, 666, (1925) (internal quotations omitted) and thus requires the protection of expression that some may dislike or even despise. See Reno v. ACLU, 521 U.S. 844, 874, (1997) ("In

evaluating the free speech rights of adults, we have made it perfectly clear that sexual

expression which is indecent but not obscene is protected by the First Amendment."

(internal quotation marks and citation omitted)); <u>Carey v. Population Servs. Int'l</u>, 431

U.S. 678, 701 (1977) ("The fact that protected speech may be offensive to some does not

justify its suppression."). The activity proscribed by DC OFFICIAL CODE §25-374

(2001)includes the very regulation of "live entertainment" and "nude dancing" described

in <u>Schad</u> as "free speech." 452 U.S. at 65-66.

### C.    Content-Based Restrictions of Free Speech Must Be Reviewed Under the Strict Scrutiny Standard.

When determining which level of scrutiny to apply to the city ordinance, the

Supreme Court noted, "we must decide whether the State's regulation is related to the

suppression of expression." <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 289

(2000)(citations omitted).  If the governmental purpose in enacting the regulation is

unrelated to the suppression of expression, then the regulation need only satisfy the "less

stringent" standard for evaluating restrictions on symbolic speech.  <u>United States v.</u>

<u>O'Brien</u>, 391 U.S. 367 (1968).  If the government interest is related to the content of the

expression, however, then the regulation falls outside the scope of the *O'Brien Test* and

must be justified under a more demanding standard.

However, just because a statute, on its face, distinguishes between content, does

not necessarily make the statute content-based for purposes of First Amendment analysis.

<u>Id</u>.  Applying the secondary effects doctrine, the ultimate question is whether the

legislature's purpose is to suppress the content of the proscribed message because of a

disagreement with that message or concern over the direct effect of that message on its

observers, instead of concern for the secondary effects of such message on the

14

community.  City of Renton v. Playtime Theatres, 475 U.S. 41 (1986) (considering

evidence of the secondary effects of adult movie theaters in Seattle residential areas,

including adverse effects on neighborhood children and community improvement efforts,

to constitute content-neutral secondary effects).  If the legislature's purpose is to suppress

the content of expression, strict scrutiny applies.  See Pap's, 529 U.S. at 289.  If the

legislature's purpose is to address secondary effects, intermediate scrutiny applies as

framed in O'Brien. 391 U.S. 367.

> **D.     DC OFFICIAL CODE §25-374 (2001)is a Content-Based Restriction on Free Speech and Therefore Must Be Reviewed under the Strict Scrutiny Standard.**

As the Supreme Court noted in United States v. Playboy Entm't Group, Inc., 529

U.S. 803, 813 (2000), "when the government restricts speech the Government bears the

burden of proving the constitutionality of its action."  Therefore, to avoid strict scrutiny

review, the *government* must present sufficient evidence to demonstrate that the

legislature's purpose, when enacting the challenged statute, was to combat the secondary

effects of the proscribed expression, rather than merely oppose the content of such

expression.  See Pap's, 529 U.S. at 289.

Here DC OFFICIAL CODE §25-374 (2001) makes distinctions on its face

regarding content, clubs that have nude dancing and clubs that do not.  As presented, the

fact that DC OFFICIAL CODE §25-374 (2001) distinguishes between content does not

necessarily make it content-based for purposes of First Amendment analysis.  If it was

designed to combat secondary effects of the proscribed expression on the community, it

must be afforded the lesser, *O'Brien test*.

The substantive question is whether there is sufficient evidence that DC OFFICIAL CODE §25-374 (2001) is designed to address the secondary effects of the proscribed expression.  However, there is scant evidence from records of legislative proceedings to suggest that the restrictions in question were enacted to address secondary effects.

However, governments are not permitted to enact laws specifically regulating secondary adult businesses absent a sufficient showing in the legislative record of negative secondary effects from adult businesses.  <u>Los Angeles v. Alameda Books</u>, 122 S.Ct. 1728 (2002).  DC OFFICIAL CODE §25-374 (2001) and its legislative and administrative records are all completely devoid of any reference to concern for secondary effects.  However, none of these claims that DC OFFICIAL CODE §25-374 (2001) will reduce these negative secondary effects are supported by any scientific studies in the legislative record.

### E.  DC OFFICIAL CODE §25-374 (2001)Fails Both Strict Scrutiny Review and the *O'Brien Test.*

DC OFFICIAL CODE §25-374 (2001) fails to meet both the requirements of strict scrutiny review and the lesser, *O'Brien Test*.  Under <u>O'Brien</u>, an ordinance is valid if: (1) it serves a substantial interest within the power of the government; (2) the ordinance furthers that interest; (3) the interest served is unrelated to the suppression of free expression; and (4) there is no less restrictive alternative. <u>See</u> <u>O'Brien</u>, 391 U.S. at 377.

In order to meet their burden under this element, the Defendants must have "some factual basis for the claim that [adult] entertainment in establishments serving alcoholic beverages results in increased criminal activity" and other undesirable secondary effects.

Grand Faloon Tavern, Inc. v. Wicker, 670 F.2d 943 (11th Cir.1982) (upholding county ordinance prohibiting nude and semi-nude entertainment in establishments licensed to sell liquor where city commissioners had evidence that substantial criminal activity took place in topless bars). The legislature need not "conduct new studies or produce evidence independent of that already generated by other cities ... so long as *whatever evidence the city relies upon is reasonably believed to be relevant* to the problem that the city addresses." Pap's, 120 S.Ct. at 1395, quoting Renton, 475 U.S. at 51-52 (emphasis added). In Barnes, for example, the Supreme Court determined that Indiana's public indecency statute reflected moral disapproval of people appearing nude in public, and found evidence in a long line of public indecency laws, dating from 1831, that the statute furthered the government's interest in protecting order and morality. See Barnes, 501 U.S. at 567-68.

Where the right to free speech is at issue, the government bears the burden of showing that the articulated concern has more than merely speculative factual grounds, and that it was actually a motivating factor. See Pap's, 529 U.S. at 289. Thus, in that case, the court held unconstitutional a city ordinance which banned nudity in establishments that served alcoholic beverages because the city failed to produce any evidence of a crime problem, the city's purported justification in passing the ordinance. Id.

It is well established law that proceedings can be reviewed only by the evidence that is present on the record. Overton Park v. Volpe, 401 U.S. 402, 419 (1971); Camp v. Pitts, 411 U.S. 138, 143 (1973). Here, the legislative record of DC OFFICIAL CODE §25-374 (2001) is devoid of any indication that evidence was presented showing that the

regulated establishments did, in fact, reduce property values and increase crime.  Rather, the record lacks any evidentiary or factual determinations on this issue.  While "inquiring into legislative motives is a hazardous matter… the legislative psyche does not mandate that [the court] turn a deaf ear" to such a record.  Kruger v. City of Pensacola, 759 F.2 851, 855-856 (11th Cir. 1985) (citing O'Brien, 391 U.S. at 383).  Rather, when the record lacks any factual determinations or evidentiary findings in support of the purported interest of the legislation the court must invalidate it.  In addition, Defendant is barred from raising any "post-hoc" rationalizations for amending DC OFFICIAL CODE §25-374 (2001)that are absent from the legislative record because such rationalizations are an inadequate basis for review that do not constitute the whole record.  Overton Park, 401 U.S. at 419 (citing SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).

## II.    PLAINTIFF'S IRREPARABLE INJURY OF LOSS OF FIRST AMENDMENT RIGHTS OUTWEIGHS DEFENDANTS' AS YET UNSUBSTANTIATED INJURY WHEN CONSIDERING A BALANCE OF HARMS.

As to Plaintiff's irreparable injury, the Supreme Court has explained that "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury."  See Elrod v. Burns, 427 U.S. 347, 373 (1976) (citation omitted).  In addition, Plaintiff faces the threat of a loss of its license, and prospectively, the loss of valuable business opportunities, which constitutes an irreparable injury as well.  In addition, the government has already stated that it intends to enforce DC OFFICIAL CODE §25-374 (2001) against Plaintiff

Although the State has a legitimate interest in establishing a uniform system of control and administration over the sale of alcohol and regulating against the proven

secondary effects of adult entertainment sale, that system is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  Id. (citations omitted).  "If anything, the system is improved by such an injunction."  Id. (citations omitted).  Therefore, the Government can not substantiate any harm and, when compared with the potential harm to Plaintiff, the balance of harms tends towards issuance of the preliminary injunction.

III.    **THE PUBLIC INTEREST IS SERVED BY GRANTING INJUNCTIVE RELIEF AS DC OFFICIAL CODE §25-374 (2001)IS LIKELY TO BE FOUND UNCONSTITUTIONAL.**

As a final prerequisite for preliminary injunction, Plaintiff must show that preliminary injunction serves the public interest. Playboy Enter., Inc. v. Meese, 639 F. Supp. 581, 587 (D.D.C. 1986) (noting that "it is in the public interest to uphold a constitutionally guaranteed right"). Therefore, the public interest is greater served by issuing the requested preliminary injunction. It is obviously in the public interest to prevent application of a statute and regulation likely to be found unconstitutional.  While the State may regulate the sale of adult entertainment and the secondary effects therefrom, the means for doing so cannot be carried out with unconstitutional restrictions on free speech.   Playboy Enter., Inc. v. Meese, 639 F. Supp. 581, 587 (D.D.C. 1986).

In Lady J. Lingerie v. City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999),  the city of Jacksonville enacted zoning laws that allowed adult entertainment establishments to operate as of right in just one area of the city.  Id.  at 1361.  Moreover, the legislation further required that an adult entertainment establishment be located a specified distance from other such businesses.  As a practical matter, only two limited areas remained available for adult entertainment businesses within the permissible zone. Id. The court

held that the subjective zoning exception criteria could not be used with regard to applicants whose businesses are entitled to First Amendment Protection. Id.  The decision in Lady J. Lingerie concerned legislation that subjected adult entertainment businesses to standards different from those applicable to other businesses.  These businesses were relegated to accepting a location in a part of a small zone in Jacksonville just like plaintiff in the instant case.

IV.    **THE PRESENT REGULATION'S PLAIN MEANING IS CLEAR AND AS SUCH THE REGULATION IS NOT SUCEPTIBLE TO MUTIPLE INTERPRETATIONS AND THEREFORE, CANNOT BE SAVED BY A NARROWING CONSTRUCTION**

Whether DC Official Code §25-374 (2001) provisions allows the holder of a Class "CN" retailer's license with nude dancing, currently located in a CM or M-zoned district, to file an application to relocate its license to an equivalent CM or M-zoned district in another part of the District of Columbia depends upon the proper interpretation of the word "same" in the phrase "transferred within the same CM or M-zoned district." There is no specific legislative history regarding DC Official Code §25-374 (2001) in the Draft Report on Bill 13-449, the Title 25, DC Code Enactment and Related Amendments Act of 2000, which was later enacted by the Council as part of DC Law 13-298, effective May 3, 2001.

When you examine the plain meaning of the statute that there are two possible interpretations of the word "same" as used in this phrase. First, the phrase "transferred within the same CM or M-zoned district" can be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing only within the specific boundaries of the particular CM or M-zoned

district in which it is currently located. Under this interpretation, the holder of a Class "CN" retailer's license with nude dancing would be prohibited from filing a license application to move its license from its existing CM or M-zoned district to an identical CM or M-zoned district in another part of the District of Columbia.

The phrase "transferred within the same CM or M-zoned district" can also be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing from its existing CM or M-zoned district to an identical or equivalent CM or M-zoned district in another part of the District of Columbia. Specifically, under this interpretation, the holder of a Class "CN" retailer's license located in a CM-1, CM-2, CM-3, or M-zoned district, as defined in Section 105.1 of Title 11 of the DCMR (Zoning Regulations) and contained in the zoning maps of the District of Columbia, would be allowed to file an application to transfer its license respectively to another CM-1, CM-2, CM-3, or M-zoned district. For example, the holder of a Class "CN" retailer's license with nude dancing approved by the Board to be located in a CM-2 zoned district would be permitted to file an application to transfer its license to another CM-2 zoned district located in another part of the District of Columbia.

This is not a hypothetical situation. The Alcoholic Beverage Regulation Administration Board were faced with these two interpretations on February 28, 2007 In The Matter of Capitol Hill Cabaret, Inc. t/a Edge/Wet Case No. 61162-07/010P and split the vote 3 – 3, an equal number for both interpretations, so it is unconstitutionally vague and must be struck down. (Exhibit 1)

DC OFFICIAL CODE §25-374 (2001) cannot be saved from being found unconstitutional through the use of a narrowing construction as the legislation's plain

meaning is clear and not susceptible to multiple interpretations.  Limiting constructions must be based on "explicit textual incorporation, binding judicial or administrative construction, or well established practice." <u>Lakewood v. Plain Dealer Publishing Co.</u>, 486 U.S. 750, 770 (1988).  There is not any evidence of judicial or administrative construction, nor even any evidence of a well established practice of enforcement upon which a limiting construction of DC OFFICIAL CODE §25-374 (2001)could be based.

Even where the Defendants' to assert a good faith assurance that DC OFFICIAL CODE §25-374 (2001) would be applied within the bounds of the Constitution, such an assurance could not save DC OFFICIAL CODE §25-374 (2001)from its constitutional flaws.  The Supreme Court has specifically stated that assurances of good faith adherence to language not present in the regulation at issue are not enough to save unqualified regulations and are specifically disallowed by "the doctrine forbidding unbridled discretion."  <u>Plain Dealer Publishing Co.</u>, 486 U.S. at 770.  Because there is not any judicial or administrative evidence of an applicable limiting construction, nor is there any evidence of a well established practice, this Court must invalidate DC OFFICIAL CODE §25-374 (2001) as it is overbroad on its face and not susceptible to any limiting constructions.

## **<u>CONCLUSION</u>**

The Plaintiff has shown that the balance of irreparable harms tips in Plaintiff's favor.  Further, there is sufficient likelihood of success on the merits of the underlying dispute.  Lastly, preliminary injunction serves the public interest.  As a result, this court must grant a preliminarily injunction and permanently enjoin the enforcement of DC OFFICIAL CODE §25-374 (2001).

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623 (Fax)
Counsel for Plaintiff

1

GOVERNMENT OF THE DISTRICT OF COLUMBIA

+ + + + +

ALCOHOLIC BEVERAGE REGULATION
ADMINISTRATION BOARD

+ + + + +

IN THE MATTER OF:

Capitol Hill Cabaret, Inc.
t/a Edge/Wet
2046 West Virginia Avenue, N.E.      Status
Retailer Class CN -License           Hearing
 Transfer to New Location
License No. 75920

Case No. 61162-07/010P

Wednesday, February 28, 2007

Hearing Room 7100
941 North Capitol Street, N.E.
Washington, D.C.  20002

        The        above-entitled        matter

convened at 10:33 a.m. before the District of

Columbia    Alcoholic    Beverage    Regulation

Administration Board.

BEFORE:
    CHARLES A. BURGER, Chairperson
    VERA ABBOTT, Member
    PETER B. FEATHER, Member
    ALBERT G. LAUBER, Member
    JUDY A. MOY, Member
    AUDREY E. THOMPSON, Member

2

1                    P-R-O-C-E-E-D-I-N-G-S

2                                    10:33 a.m.

3           CHAIRPERSON BURGER:  We're back

4    on the record.  First, I would like to

5    apologize.  We're running a little late this

6    morning.

7              The Board's been in intensive

8    discussion regarding an issue that's a matter

9    before us.  So, I do want to apologize to

10   everyone who is here because -- for their

11   time.  We do appreciate it, but the -- this

12   matter before us did require our immediate

13   attention.

14             The issue I'd like to call at

15   this point is Capitol Hill Cabaret, Inc.

16   trading as Edge/Wet, 2046 West Virginia

17   Avenue, N.E., license number 75920, case

18   number 61162-07/010P.

19             Good morning, gentlemen.

20             MR. FONSECA:  Good morning.

21   Michael --

22             CHAIRPERSON          BURGER:

1    Introductions please.

2              MR. FONSECA:   Michael Fonseca on

3    behalf of the licensee.   With me is Ron --

4    Ronald   Hunt,   the   president   of   the

5    corporation.

6              CHAIRPERSON   BURGER:      Good

7    morning.   In this particular case, we do have

8    a request before us regarding a transfer to a

9    new location.

10             The issues that the Board -- were

11   asked several times were in particular regard

12   to legislative law which stated that the or

13   indicated that there were some considerations

14   on where the licensee could transfer their

15   license.  This area in a particular -- and in

16   this particular area underwent eminent domain

17   questions and following legislation allowing

18   transfer   of   these   licenses,   left   language

19   which needed to be interpreted by the Board.

20             The strict interpretation of the

21   language   which   was   forwarded   by   several

22   advocates of that was that it would strictly

4

1   prohibit the licensee from moving in any

2   other specific area except the zoning area

3   that they were in.  It did not address moving

4   between different pockets the same zoning,

5   but stated that that one contiguous area that

6   they were in, they were required to stay.

7         The Board at that time issued a

8   ruling that that was not our -- we did not

9   take that strict interpretation and our

10  interpretation and position was that the

11  licensee in this particular case, I think

12  it's a CM 2, could move to other CM 2 zoning

13  and that was our position at the time when

14  asked by Applicants.

15        This application requests a

16  change from rather than -- going from a CM 2

17  to another CM 2 is from a CM 2, I think, to a

18  CM 3.  Excuse me.  Or 1.  Which is a

19  different CM class.

20        And from our first

21  interpretation, we were asked to address this

22  matter.

1          We've given this a tremendous

2     amount of discussion over the last several

3     weeks and have consulted a number of

4     different sources for direction and legal

5     opinion and in that regard, we want to hear

6     from each individual Board Member on their

7     vote, but I'll save my concluding remarks of

8     my own opposition.

9          But, I would state that through

10     our discussions and through investigation and

11     we -- it resulted in the action of the Board

12     at this time does not have the majority of

13     the Board accepting the interpretation of the

14     Applicant in allowing the transfer of the

15     license between these two different types of

16     CM districts and at this time, this transfer

17     cannot be accepted by the Board at this time

18     and cannot be granted.

19          I would note that this has been a

20     well discussed and well thought out decision

21     from the group, but a majority was not

22     received in support of the Applicant's

6

1    request to transfer the license and at this

2    time, I will ask for the vote and comment of

3    each Board Member.

4             Mr. Lauber.

5             MEMBER LAUBER:   Thank you, Mr.

6    Chair.   This is a question of nude dancing

7    licenses which are currently in places that

8    have   now   been   taken   over   by   economic

9    development and they're seeking new locations

10   and there are not many places in the city

11   where it's possible to go.

12             Unfortunately, the zoning -- the

13   statute  which  we  are  construing  here  was

14   enacted many, many years ago when there were

15   vast industrial wastelands all over the city

16   and there were many places people could move

17   and that's changed.   But, unfortunately, I

18   feel  constrained  by  the  language  of  the

19   statute that we operate under to vote to --

20   against  permitting  the  transfer  of  the

21   license and the Board is deadlocked 3/3 on

22   this issue.

1           In my mind, it's up to the

2    Council to amend the law to fix this problem.

3     It's a statutory problem.  It's a political

4    question I think where nude dancing should be

5    allowed in the city.  There are strong views

6    on both sides.  I think it's not the Board's

7    job to pretermit the discussion by the

8    Council on this issue.

9           So, I reluctantly, somewhat

10   reluctantly vote to not permit the transfer.

11          CHAIRPERSON BURGER:  Thank you,

12   Mr. Lauber.  Mr. Feather.

13          MEMBER FEATHER:  Yes, I believe

14   that in addition to Mr. Lauber's comment that

15   this licensee has found themselves in a

16   predicament not of their own making.  I also

17   believe that they should be allowed to move

18   from a CM 2 to CM 1 zone and for that reason

19   and accordingly, that's the way I vote.

20   Thank you.

21          CHAIRPERSON BURGER:  Thank you,

22   Mr. Feather.  Mrs. Abbott.

1          MEMBER  ABBOTT:    Thank  you,

2    Chairman Burger.  As a business decision and

3    in  support  of  the  dislocated  licensee,  I

4    believe  relocation  in  this  situation  should

5    be  granted  especially  as  it  appears  that

6    there's not any community opposition to this

7    licensee relocating to West Virginia Avenue,

8    N.E. I believe it is.

9          So,  that's  my  decision  please

10   pending  further  legislative  action  by  the

11   City Council.  Thank you.

12         CHAIRPERSON  BURGER:    Thank  you,

13   Mrs. Abbott.  Ms. Thompson.

14         MEMBER  THOMPSON:    Yes.    Thank

15   you, Mr. Chair.  I wholeheartedly agree with

16   Board Member Lauber and I feel very strongly

17   that this is an area that the D.C. Council

18   definitely needs to get involved in because

19   this  affects  not  just  one  licensee,  but

20   several licensees.

21         However,  based  on  the

22   interpretation of our statute and the regs,

1   my vote -- the interpretation prevents my

2   being able to vote for this transfer.  So,

3   reluctantly, I have to -- I am voting no to

4   this transfer.

5          However, I will -- I have said

6   and I will say it again that we as a Board

7   need to communicate this over to the Council

8   that there is an area of the law that needs

9   their attention to address this matter so as

10  to not put our licensees at a disadvantage

11  over a situation that was created by the

12  government and I will continue to ask my

13  colleagues to join me in that communique the

14  Council.

15         But, however, as far as the

16  transfer as it sits now and as the statute

17  sits now, my vote is no.

18         Thank you, Mr. Chair.

19         CHAIRPERSON BURGER:  Thank you.

20  Ms. Moy.

21         MEMBER MOY:  I concur with my

22  fellow Board Members Lauber and Thompson and

1    I am voting against the transfer from a CM 2

2    to a CM 1 at this time.

3              CHAIRPERSON BURGER:    Thank you.

4    As  I'm  sure  reflected  by  my  esteemed

5    colleagues here, this has maybe been crafted

6    to be a tough decision.  This issue is not an

7    issue that's new to anyone that's regarding a

8    transfer  and  this  zoning  question  and  how

9    it's been  addressed  in  the  law  which  we're

10   asked to interpret.  This is not a new issue.

11    This issue's been around for several months.

12    The  Board made  a  ruling  at  a  time  on  its

13   interpretation  which  at  the  time  was  not  a

14   strict definition of the law and for a number

15   of  my  colleagues  with  good  argument,

16   excellent argument, in fact, I respect their

17   opinion  in  their  interpretation  asking  to

18   reinterpret  what  we've  done.   That  they've

19   felt  that  their  interpretation  could  not

20   support this position of going from a CM 2 to

21   CM 3.

22              But,  as  been  noted  by  my

11

1    colleagues, one remedy for this and which has

2    been out there has been to remedy this

3    through a correction legislatively that we

4    can have a proper and in this case, we do not

5    have a majority that feels that the law

6    supports our decision or their -- the law

7    does not support the ability to get a

8    majority.

9         My position on this is in

10    particular with zoning issues. Zoning is in

11    this particular case and our major concern

12    should be usage and protection of the public

13    and in this regard, we do not have a

14    protested in this particular case and also

15    there would be no -- any different

16    substantial impact regarding going from a CM

17    2 to CM 3.

18         So, myself personally, while

19    greatly respecting the opinion of my

20    colleagues, I view that it possibly could and

21    I would be -- I would side with Mrs. Abbott

22    and Mr. Feather.

1          But, again, here we have a 3 to 3

2    vote   and   this   will   call   for   additional

3    remedy.

4          I do want to make it clear that

5    as  you  can  see  our  position  up  here  is  a

6    matter of degrees, but it solely rests on the

7    fact that there is not proper -- the Board

8    has been called on and is divided over giving

9    interpretation to a -- to legislation which

10   needs  to  be  looked  at  I  think  by  the

11   legislators and I think that's one thing we

12   can  all  agree  on.   But,  that  needs  to  be

13   done.

14          In  light  of  that,  as  we  stand

15   with the 3 to 3 vote, the transfer cannot be

16   granted at this time.  We will allow ten days

17   for reconsideration of this matter.

18          If are there are any points as

19   far as to anything in writing regarding our

20   decision, you can contact Mr. Moosally.

21          MEMBER   THOMPSON:    Point   of

22   information.

13

1          CHAIRPERSON BURGER:  Yes.

2          MEMBER THOMPSON:  Mr. Chair, just

3    for the record, I believe I heard you say

4    that the transfer was for a CM 2 to a CM 3.

5          CHAIRPERSON BURGER:  It's to a CM

6    1.

7          MEMBER THOMPSON:  Okay.  I just

8    wanted to make it clear on the --

9          CHAIRPERSON BURGER:  Thank you.

10          MEMBER THOMPSON:  Thank you.

11          CHAIRPERSON BURGER:  Thank you

12    very much.  Yes.

13          MR. FONSECA:  Could we make a few

14    comments?

15          CHAIRPERSON BURGER:  Please.

16          MR. FONSECA:  You know, aside

17    from our arguments, I think to some extent

18    the Board although they're divided and

19    believe that it's a legislative remedy that's

20    needed, the legislature attempted to do this

21    and frankly, to some extent, the Executive to

22    the Office of Planning, the legislative

1    branch  through  the  offices  of  the  Council

2    Members  during  this  whole  baseball  stadium

3    planning  stage  established  a  map,  presented

4    it  to  the  entire  affected  community  of  ABC

5    licensees  and  non-ABC  licensees  that  had

6    businesses  that  were  going  to  be  impacted  and

7    color  coded  the  areas  that  they  could  move

8    to.    It  was  clear  that  there  was  no

9    distinction  between  the  CM  zones.

10           We've  made  the  argument.    I

11    understand  that  it  fell  on  less  than  the

12    majority  ears.    That  the  distinctions  between

13    the  CM  1,  2  and  3  go  to  heightened  density

14    only  and  not  to  permitted  use.    I  think

15    frankly  the  --  the  Board  we  would  ask  that

16    they  hold  this  application  and  not  dismiss

17    since  there  really  is  no  action  taken  by  the

18    3/3.    We  understand  that  wouldn't  allow  you

19    to  grant  it,  but  to  put  us  in  an  inferior

20    position  where  we  now  stand  without  objection

21    and  have  to  come  back  after  perhaps  we  get

22    some  emergency  legislation.

1          As you're aware, Council Member

2     Graham almost a year ago attempted to do this

3     and withdrew it based on the understanding

4     through consultations that this may work out

5     without having to do it and the intent all

6     along has been to assist all of these

7     licensees to be able to relocate.

8          The original legislation was for

9     that reason because it was becoming quite

10    clear that the only place that new dancing

11    licenses historically could move to was the

12    central business district.  Well, it's now

13    living downtown.  It's impossible.  There

14    isn't a single address in the central

15    business district that would allow it.

16          So, we effectively now are

17    presented with perhaps not an individual

18    address in a commercial industrial zone and

19    we will probably in writing seek

20    reconsideration and make some arguments, but

21    I just needed to put on the record what for

22    lack of a better term really has become and

1    not the Board's fault, but a bait and switch

2    by the Executive and the Council and dumping

3    it on the Board.        And I know Mr. Hunt

4    wants  to  talk  and  I  hope  it's  not  too

5    emotional, but now you're talking about the

6    impact  on  a  lost  business  and  one  that's

7    shuttered now for months and with now no --

8    necessarily any hope of when it's going to be

9    able to reopen.

10           MR.   HUNT:   Three  things  very

11   quickly.  Hi, everybody.

12           About  four  years  ago,  a  map  was

13   brought  to  my  office  before  the  stadium  was

14   even  heard  about  coming  in  because  I  wanted

15   to  move  one  of  my  businesses.    From  the

16   Council Member's office, they color-coded an

17   area,  C 1,  C 2,  CM 1,  CM 2,  CM 3 and CM

18   zones.

19           I  said  what's  the  difference  in

20   the  zones.    I  was  told  there  is  no

21   difference.  I said no problem.  I held back.

22    Then I heard the stadium was coming in.  So,

1    there was no difference in the CM zone.

2            We went before Graham about a

3    year and a half, two years ago.  We had

4    extensive meetings with him in his office.  I

5    personally because I basically ran the whole

6    club zone over there.  You can ask every club

7    owner.  I kept the place clean.  I took care

8    of the community.  Took care of the police

9    department.  Made sure everybody did what

10   they were suppose to do and by me being in

11   front of you so many times, you know I'm very

12   strict when I believe in something.

13           So, I sat before Council Member

14   Graham and I said these are the same zones.

15   So, my words are actually what you're

16   interpreting up there.  Those are my words

17   because my interpretation of those words, but

18   there were no difference in the zones.  I

19   then took it upon myself back then and you

20   can talk to Jeff Coudre when I helped write

21   the law, turned it from 300 feet to 600 feet

22   to my detriment now.

1          So, that's everything for the

2    city again.  Community gone country.

3          I've done my part in the

4    community.  I've gotten rid of drug dealers

5    singlehandedly.  I don't like talking about

6    it, but now it needs to be said.  I've gotten

7    over 26 awards from the police department.  I

8    take care of my community.

9          I also went out of my way to find

10   a place directly in front of a graveyard so I

11   do not impact the community at all.  I've

12   already proven I run a quiet business.  No

13   problems whatsoever.

14         You had a problem at one of my

15   other establishments.  I went there.  When I

16   put my foot down, you said there was not an

17   issue with the police department, with

18   anybody when I got in there because I fired

19   everybody.

20   I went far and beyond what you asked me to

21   do.        Now, my own words have come back

22   to bite me in my behind.  The same CM zone, I

1    did that.  That was my words because my

2    understanding of it and the law states there

3    is no difference in use, CM 1, CM 2, CM 3 and

4    CM.

5          I might not be a high school

6    graduate, but I know how to understand

7    something and read and because that was my

8    interpretation, when Graham and myself sat

9    down and we discussed this, what could be

10   good for all of the clubs being displaced,

11   that was our interpretation.  The same.  Not

12   we move from CM 2 to -- that would have been

13   said knowing that this would have come up.

14          But, the law states that it's

15   not.  That's why I don't understand why

16   there's a different interpretation.

17          The last thing I want to say

18   before I leave, I cannot feed my family.

19          You need me.  A club owner like

20   me that comes in here before you.  Sometimes

21   I'm very emotional, but at least I tell you

22   the truth where half the people behind me do

1   not.         You know that I'm going

2   to follow the law.  You know when you ask me

3   to do something I'm going to get it done and

4   last -- last in that conversation, there are

5   no drugs. There are no this, that and the

6   other in my club that you can go to every

7   other club and find.

8        Why don't you want me?  I did

9   everything right.  A graveyard.  Who am I

10  disturbing?  A graveyard.  Six hundred feet,

11  that's my doing, too.  The same.  Those are

12  my words.  I didn't have the wrong

13  interpretation.  Why do you?

14       That's all I'd like to say.

15  Thank you.

16       CHAIRPERSON BURGER:  And I would

17  like speak for the -- not -- well, I think I

18  speak for the Board.  If not, I'm sure

19  they'll jump in.

20       I don't think anyone disagrees

21  with anything that you stated.  I think where

22  we have to look is the fact that the law and

1    regulations are written for a reason.    I

2    don't know the intent nor is it my job to

3    rewrite or the Board's job to rewrite

4    legislation.

5            There was a reason that it was

6    put CM 2 in the law rather than just CM.    If

7    it would have said within a CM district or

8    within, that's what -- what the politicians

9    and that's their job is to be political and

10    they made a decision to restrict.    But, the

11    point is how that occurred.

12            Well, I don't -- I -- and

13    necessarily, I don't think you wrote the law.

14    I think there are people that write the law

15    and you may have assisted in writing it or

16    agreeing to it, but I think there are people.

17    You know, the -- but, it is the law and it

18    is in writing.

19            I would have to say that the --

20    okay.    Excuse me.    I've been -- the same I

21    meant rather than a CM 1 or CM 2.

22            Thank you.

1          MR. HUNT:  That's what I --

2          CHAIRPERSON  BURGER:    Thank  our

3    legal counsel.

4          And  as  I  said,  this  is  not  a

5    matter -- the one thing the Board will not do

6    until  we  are  asked  to  constantly  by  people

7    who particularly want a -- and I'm not saying

8    you're  doing,  but  the  Board  does  not  write

9    the  law.  We  try  to  interpret  it  as  best  we

10   can  and  in  that  regard  with  the  language

11   given  after  different  legal  opinion,  out

12   decision which was closely watched was a more

13   liberal  interpretation  of  it  when  we  did

14   state CM 2 to CM 2.

15         Now,  that  may  not  --  and  I  don't

16   think  in  this  case  that  provides  you're

17   looking  for,  but  as  I  said,  I  don't  think  we

18   have  any  --  I  think  we're  in  complete

19   agreement  with  on  your  interpretation  of

20   yourself  and  the  situation  that  the  law  has

21   created.

22         So,  in  this  particular  case,  I

1  would note that we're not acting against this

2  application.  We just do not have a majority

3  at the time that can and we'd have to say

4  respectfully from all of us, you know, that

5  is our position at this time.

6          We would allow ten days for

7  reconsideration of this decision.  If you

8  have any additional information of if you can

9  provide any additional insights that we

10  haven't looked at yet regarding our

11  interpretation, that would be greatly

12  appreciated.  Because frankly we're all aware

13  of what this does.

14          But, the point being we can't

15  create law and policy here.  We just have to

16  do the best job we can to interpret.

17          MR. FONSECA:  If I may, in other

18  matters where there have been legislative

19  changes while a matter was pending before the

20  Board, the legislative change is operative.

21          CHAIRPERSON BURGER:  Correct.

22          MR. FONSECA:  Because the case is

1    -- so, I again ask the Board since there

2    hasn't been an affirmative act of the Board

3    in either case, we understand that 3/3 tie

4    doesn't allow a granting of the transfer, but

5    it shouldn't consider it -- the ability to

6    dismiss this application so that the matter

7    is just returned to files and stay in the

8    Board's system as an -- as an active

9    application which the Board can't act upon.

10           CHAIRPERSON BURGER:  Well, it --

11   as --

12           MR. FONSECA:  So, we can get the

13   legislative change we need.

14           CHAIRPERSON  BURGER:   Yes,  we

15   won't be -- you know, it would require a

16   written order to dismissing this and I will

17   just state we will not be in any type of --

18   we have many other things and I'm sure by the

19   time we get to that, it'll be sufficient time

20   to allow those actions to occur.

21           But, anything we can do to assist

22   in that as far as pointing out the Board's

1   opinion.  I think our position on assisting

2   your license I think frankly that is at the

3   heart of everyone -- everyone's concern now

4   and again, the Board, I would state our major

5   concern now is what happens to our licensees

6   that find themselves in this situation.  So,

7   we would do everything we can to assist in a

8   remedy also.  But, we are not able to act on

9   this now.

10          MR.  HUNT:   May  I  ask  one

11  question?

12          CHAIRPERSON BURGER:  Yes.

13          MR.   HUNT:    The    ten-day

14  consideration period, that means everyone up

15  here is going to think about it some more and

16  maybe change their vote?

17          CHAIRPERSON  BURGER:   I'm  sure

18  we're thinking about it a lot.  If you have

19  any additional information, we would I think

20  -- even expansion on these discussions --

21  initial  discussions  or  presentations  in

22  zoning.  If there were grounds there that we

1    could look at the interpretation.

2           I'm sure we'll examine anything

3    you can submit and we'll keep a -- I can say

4    that we have more than an open mind up here

5    as far as our positions and as I said, we

6    also have a deep concern on the fate of these

7    licenses which I think for a number of

8    reasons, this is just my opinion personally,

9    but I know it's shared by some that it is

10    just rather not -- it's rather unjust.  I

11    would actually say that.

12           We have heard enough that there

13    have been at a minimum mis-communication

14    between and I -- that's as far as I'll go

15    from here.

16           MR. HUNT:  You can change your

17    mind within the next ten days.

18           CHAIRPERSON BURGER:  It leaves us

19    free to do anything we want to.

20           MR. HUNT:  Yes.  Thank you.

21           CHAIRPERSON BURGER:  We can

22    change it either way, but my point being we

1    would like to focus on this within the next

2    ten days.  But, we will not be issuing a

3    written decision on this.  So, this will

4    remain open and active.

5              MR. FONSECA:  Thank you.

6              CHAIRPERSON BURGER:  Okay.  Thank

7    you very much.  Again, my apologies, but due

8    to the seriousness of this issue, it's

9    necessary to take the additional time this

10   morning.

11             (Whereupon, the hearing was

12   concluded at 10:59 a.m.)

13

14

15

16

17

18

19

20

21

22

### DECLARATION OF WARREN WHITEHEAD

I, Warren Whitehead, am over 18 years of age, and I am the owner of Mystery Productions Entertainment, LLC, t/a Club Rendezvous at 2840 Alabama Avenue, S.E., Washington, DC 20020, declare as follows:

I have direct personal knowledge of the facts stated herein and would be competent to testify to same at trial.

I am a holder of a Class "CN" retailer's license where nude dancing is permitted. This particular area where my club is located underwent eminent domain by the District of Columbia Government. I have been notified by D.C. Government Officials that the government plans to enforce DC Official Code §25-374 (2001), a zoning ordnance, against me. The alleged purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. Because of DC Official Code §25-374 (2001), there is only one location where I can move, if a location was available, and that is the central business district of the city. In real terms, the government enforcing DC Official Code §25-374 (2001) against my club means I will be out put out of business for one reason, because I have nude dancing. This law only applies to adult entertainment establishments.

I am forced to leave an area that the club has been located in since 1992. I am in a predicament not of my own making. Simply because my license permits nude dancing, I am be treated differently, disadvantaged and not equal to a bar, nightclub, hip-hop club, a liquor store and/or a club that plays violent go-go music. They can move anywhere in the city but I cannot because my license (issued by the government) allows for non-obscene nude dance performances. This situation was created by the government not my actions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:     Washington,  DC
              April 17, 2007


_____
          Warren Whitehead