**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CLOUMBIA**

———————————————————

MYSTERY PRODUCTIONS : 
ENTERAINMENT, LLC, : 
T/A CLUB RENDEZOUS : 
 : 
 : 
 : 
       Plaintiff, :      Case No.:  HHK-07-00707
 : 
v. : 
 : 
DISTRICT OF COLUMBIA : 
GOVERNMENT : 
 : 
 : 
       Defendant. :

———————————————————

### <u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

COMES NOW, Plaintiff, Mystery Productions Entertainment, by and through undersigned counsel Jimmy A. Bell, Esq., and the Law Office of Jimmy A. Bell, P.C., and respectfully submits this Opposition to Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment.  For cause, the Plaintiff states the following:

### <u>STATEMENT OF FACTS AND PROCEDURAL BACKGROUND</u>

Plaintiff is a corporation organized and existing under the laws of the state of District of Columbia. Defendant has been sued for its responsibility and threat of enforcement of DC Official Code §25-374 (2001).  Warren Whitehead, is the owner of Mystery Productions Entertainment, LLC, t/a Club Rendezvous at 2840 Alabama Avenue, S.E., Washington, DC 20020. There has been city authorized nude dancing at that location since 1992. <u>Exhibit 1, Declaration of Warren Whitehead</u>. The club holds a



Class "CN" retailer's license where nude dancing is permitted. This particular area where the club is located underwent eminent domain by the District of Columbia Government.

On April 18, 2007, Plaintiff filed its Complaint against Defendant, as well as a Motion for Injunctive Relief. Defendant filed its Opposition to Plaintiff's Motion for Injunctive Relief on May 7, 2007 and its Answer to Plaintiff's Complaint on May 21, 2007. On May 31, 2007, this Court issued an order denying Plaintiff's request for injunctive relief. Defendant's instant Motion was filed on June 8, 2007.

Prior to filing its Complaint, Plaintiff was notified by D.C. Government Officials that the government plans to enforce DC Official Code §25-374 (2001), a zoning ordnance, against his club. Exhibit 1. The alleged purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. The possible locations in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing may file an application to transfer its license are contained in DC Official Code §25-374 (2001). This provision states in relevant part as follows:

> "A license under §25-371(b) may only be transferred to a location in the Central Business District or if the licensee is currently located in a CM or M-zoned district, transferred within the same CM or M-zoned district as identified in the zoning regulations of the District of Columbia and shown in the official atlases of the Zoning Commission of the District of Columbia . . ." (Emphasis added).

Because of DC Official Code §25-374 (2001), there is only one location where plaintiff can move, if a location was available, the central business district of the city. Exhibit 1. In real terms, the government enforcing DC Official Code §25-374 (2001) against plaintiff means he will be out put out of business for one reason, because he has

2


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

nude dancing. This law only applies to adult entertainment establishments. The statute does not apply to bars, nightclubs, hip-hop clubs, a liquor stores and/or clubs that play violent go-go music. DC Official Code §25-374 (2001); <u>Exhibit 1</u>. They can move anywhere in the city, but plaintiff cannot because his license (issued by the government) allows for non-obscene nude dance performances. <u>Id.</u>

Additionally, whether DC Official Code §25-374 (2001) provisions allows the holder of a Class "CN" retailer's license with nude dancing, currently located in a CM or M-zoned district, to file an application to relocate its license to an equivalent CM or M-zoned district in another part of the District of Columbia depends upon the proper interpretation of the word "same" in the phrase "transferred within the same CM or M-zoned district." There is no specific legislative history regarding DC Official Code §25-374 (2001) in the Draft Report on Bill 13-449, the Title 25, DC Code Enactment and Related Amendments Act of 2000, which was later enacted by the Council as part of DC Law 13-298, effective May 3, 2001.

Examining the plain meaning of the statute yeilds two possible interpretations of the word "same" as used in the regulation at issue. First, the phrase "transferred within the same CM or M-zoned district" can be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing only within the specific boundaries of the particular CM or M-zoned district in which it is currently located. Under this interpretation, the holder of a Class "CN" retailer's license with nude dancing would be prohibited from filing a license application to move its license from its existing CM or M-zoned district to an identical CM or M-zoned district in another part of the District of Columbia. The phrase "transferred within



the same CM or M-zoned district" can also be interpreted to permit the filing of a transfer

to a new location application by the holder of a Class "CN" retailer's license with nude

dancing from its existing CM or M-zoned district to an identical or equivalent CM or M-

zoned district in another part of the District of Columbia.  Specifically, under this

interpretation, the holder of a Class "CN" retailer's license located in a CM-1, CM-2,

CM-3, or M-zoned district, as defined in Section 105.1 of Title 11 of the DCMR (Zoning

Regulations) and contained in the zoning maps of the District of Columbia, would be

allowed to file an application to transfer its license respectively to another CM-1, CM-2,

CM-3, or M-zoned district.  For example, the holder of a Class "CN" retailer's license

with nude dancing approved by the Board to be located in a CM-2 zoned district would

be permitted to file an application to transfer its license to another CM-2 zoned district

located in another part of the District of Columbia.

On June 7, 2006, the Alcoholic Beverage Regulation Administration Board

decided that the latter interpretation would give meaning to the regulation and thus found

that an affected business could apply to relocate only to a district zoned identical to the

district from which relocation was sought. Exhibit 2.  ABRA specifically stated that: " we

conclude that DC Official Code § 25-374 (2001) allows the holders of a Class "CN" retailer's

license with nude dancing approved by the Board to be located in a CM-1, CM-2, CM-3, or M

zoned district to file an application to transfer its license to a corresponding CM-1, CM-2, CM-3,

or M zoned district located in another part of the District of Columbia." Id.  ABRA went on to

reiterate that §25-374(1) prohibits a license holder with nude dancing to relocate to within from

another license holder with nude dancing. Id.  This restriction is only placed on adult

entertainment and not on other businesses licensed to sell alcoholic beverages.



Plaintiff and its agents and employees will be injured by the existence and threatened enforcement of DC OFFICIAL CODE §25-374 (2001) in that they will be chilled and restrained in their exercise of their free rights to express certain messages during the course of dance performances. Exhibit 1.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

1.  Plaintiff is a corporation organized and existing under the laws of the state of District of Columbia.

2.  Defendant is sued for its responsibility and threat of enforcement of DC Official Code §25-374 (2001).

3.  Warren Whitehead, is the owner of Mystery Productions Entertainment, LLC, t/a Club Rendezvous at 2840 Alabama Avenue, S.E., Washington, DC 20020. There has been city authorized nude dancing at that location since 1992. Exhibit 1, Declaration of Warren Whitehead. The club hold a Class "CN" retailer's license where nude dancing is permitted. This particular area where the club is located underwent eminent domain by the District of Columbia Government.  Plaintiff was notied notified by D.C. Government Officials that the government plans to enforce DC Official Code §25-374 (2001), a zoning ordnance, against his club. Id.  The alleged purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. The possible locations in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing may file an application to transfer



its license are contained in DC Official Code §25-374 (2001).  This provision

states in relevant part as follows:

> "A license under §25-371(b) may only be transferred to a
> location in the Central Business District or if the licensee is
> currently located in a CM or M-zoned district, <u>transferred
> within the same CM or M-zoned district</u> as identified in the
> zoning regulations of the District of Columbia and shown
> in the official atlases of the Zoning Commission of the
> District of Columbia . . ." (Emphasis added).

4.      Because of DC Official Code §25-374 (2001), there is only one location where

plaintiff can move, if a location was available, the central business district of the

city. <u>Exhibit 1</u>. In real terms, the government enforcing DC Official Code §25-

374 (2001) against plaintiff  means he will be out put out of business for one

reason, because he has nude dancing. This law only applies to adult entertainment

establishments. The statute does not apply to bars, nightclubs, hip-hop clubs, a

liquor stores and/or clubs that plays violent go-go music. DC Official Code §25-

374 (2001); <u>Exhibit 1</u>. They can move anywhere in the city, but plaintiff cannot

because his license (issued by the government) allows for non-obscene nude

dance performances. <u>Id.</u>

8.      Additionally, whether DC Official Code §25-374 (2001) provisions allows the

holder of a Class "CN" retailer's license with nude dancing, currently located in a

CM or M-zoned district, to file an application to relocate its license to an

equivalent CM or M-zoned district in another part of the District of Columbia

depends upon the proper interpretation of the word "same" in the phrase

"transferred within the same CM or M-zoned district."  There is no specific

legislative history regarding DC Official Code §25-374 (2001) in the Draft Report



on Bill 13-449, the Title 25, DC Code Enactment and Related Amendments Act of 2000, which was later enacted by the Council as part of DC Law 13-298, effective May 3, 2001.

9.      When you examine the plain meaning of the statute that there are two possible interpretations of the word "same" as used in this phrase. First, the phrase "transferred within the same CM or M-zoned district" can be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing only within the specific boundaries of the particular CM or M-zoned district in which it is currently located.  Under this interpretation, the holder of a Class "CN" retailer's license with nude dancing would be prohibited from filing a license application to move its license from its existing CM or M-zoned district to an identical CM or M-zoned district in another part of the District of Columbia.

10.     The phrase "transferred within the same CM or M-zoned district" can also be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing from its existing CM or M-zoned district to an identical or equivalent CM or M-zoned district in another part of the District of Columbia.  Specifically, under this interpretation, the holder of a Class "CN" retailer's license located in a CM-1, CM-2, CM-3, or M-zoned district, as defined in Section 105.1 of Title 11 of the DCMR (Zoning Regulations) and contained in the zoning maps of the District of Columbia, would be allowed to file an application to transfer its license respectively to another CM-1, CM-2, CM-3, or M-zoned district.  For example, the holder of a Class "CN"

7


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

retailer's license with nude dancing approved by the Board to be located in a CM-2 zoned district would be permitted to file an application to transfer its license to another CM-2 zoned district located in another part of the District of Columbia.

11. This is not a hypothetical situation. The Alcoholic Beverage Regulation Administration Board were faced with these two interpretations on June 7, 2006 ABRA decided that the latter interpretation would give meaning to the regulation and thus found that an affected business could apply to relocate only to a district zoned identical to the district from which relocation was sought. Exhibit 2.

12. ABRA specifically stated that: " we conclude that DC Official Code § 25-374 (2001) allows the holders of a Class "CN" retailer's license with nude dancing approved by the Board to be located in a CM-1, CM-2, CM-3, or M zoned district to file an application to transfer its license to a corresponding CM-1, CM-2, CM-3, or M zoned district located in another part of the District of Columbia." Id.  ABRA went on to reiterate that §25-374(1) prohibits a license holder with nude dancing to relocate to within from another license holder with nude dancing. Id.  This restriction is only placed on adult entertainment and not on other businesses licensed to sell alcoholic beverages.

13. Plaintiff and its agents and employees will be injured by the existence and threatened enforcement of DC OFFICIAL CODE §25-374 (2001) in that they will be chilled and restrained in their exercise of their free rights to express certain messages during the course of dance performances. Exhibit 1.

## ARGUMENT

## I.    STANDARDS OF REVIEW

### A.    Motion to Dismiss According to Rule 12(b)6.



Under Federal Rule of Civil Procedure 12(b)(6), a court should not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint, and not its supporting facts. <u>Neitzeke v. Williams</u>, 490 U.S. 319, 326-27 (1989). Fed. R. Civ. P. 8(a)(2) only requires Plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 512 (2002). Granting Defendant's motion at this stage in litigation would, in effect, allow Defendants to circumvent the mandates espoused by a unanimous Supreme Court. Justice Thomas, writing for the Court, explained: "[t]his simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and dispose of unmeritorious claims." <u>Swierkiewicz</u>, 534 U.S. at 512.

The Court's rationale envisions a timeline, with a Plaintiff's requirement to meet notice pleading standards in the early stages, discovery in the middle stages up to and including depositions of plaintiffs and any motions for summary judgment once unmeritorious claims are evinced through fruitful discovery. Plaintiff has pled facts sufficient to meet the standards set forth in Federal Rule of Civil Procedure 8(a)(2).

### B.    Motion for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, the Court should only grant summary judgment when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Haavistola v. Community Fire Co. of Rising Sun, Inc.</u>, 6 F.3d 211,



214 (4th Cir. 1993); Etefia v. East Baltimore Comm. Corp., 2 F. Supp.2d 751, 756 (D.Md. 1998). The court is required to "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991) (citations omitted). Evidence submitted by the non-movant is to be believed and all justifiable inferences drawn in his or her favor.  While the non-moving party must do more than merely raise some doubt as to the existence of a fact, the moving party ultimately bears the burden of demonstrating the absence of all genuine issues of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

        Fed. R. Civ. P. 8(a)(2) only requires Plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Swierkiewicz v. Sorema, 534 U.S. 506, 512 (2002); Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004). Granting Defendant's motion at this stage in litigation would, in effect, allow Defendants to circumvent the mandates espoused by a unanimous Supreme Court. Justice Thomas, writing for the Court, explained: "[t]his simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and dispose of unmeritorious claims." Swierkiewicz, 534 U.S. at 512.

        The Court's rationale envisions a timeline, with a Plaintiff's requirement to meet notice pleading standards in the early stages, discovery in the middle stages up to and including depositions of plaintiffs and any motions for summary judgment once unmeritorious claims are evinced through fruitful discovery.  Plaintiff has pled facts sufficient to meet the standards set forth in Federal Rule of Civil Procedure 8(a)(2).



II.    **PLAINTIFF HAS STANDING AND PLAINTIFF'S CLAIMS ARE RIPE AS PLAINTIFF CHALLENGE'S THE INSTANT RESTRICTION'S CONSTITUTIONALITY ON ITS FACE.**

Plaintiff brings a Constitutional challenge against DC OFFICIAL CODE §25-374 (2001) on overbreadth grounds and other state and federal constitutional violations. The overbreadth doctrine is "a departure from traditional rules of standing." Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). Under this doctrine, a Plaintiff may "challenge a statute on its face because it also threatens others not before the court -- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Board of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (internal quotations and citation omitted). Here, the overbreadth doctrine allows Plaintiff to assert the First and Fourteenth Amendment rights of those who do wish to "present or act" in Constitutionally protected speech, even if Plaintiff here does not. See, e.g., Deja Vu of Nashville, Inc. v. Metro. Gov't, 274 F.3d 377, 387 (6th Cir. 2001). In the event that an overbreadth challenge is successful, "any enforcement" of the regulation at issue is "totally forbidden." Broadrick, 413 U.S. at 613.

The Plaintiff is not required to demonstrate that its conduct is expressive before bringing an overbreadth challenge. The Supreme Court has expressly rejected this position by stating that, "It is well established that in the area of freedom of expression an overbroad regulation may be subjected to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." Forsyth County v. Nationalist Movement, 505 U.S. 123, 129 (1992), citing, City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798-99 (1984); Board of Airport


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987). The Court

went further to state that, "This exception from general standing rules is based on an

appreciation that the very existence of some broadly written laws has the potential to chill

the expressive activity of others not before the court." Id. The Supreme Court has

expressly allowed a party to challenge a law, like the instant one, "in cases where the

ordinance sweeps too broadly, penalizing a substantial amount of speech that is

constitutionally protected." Id. at 130; see generally Watchtower Bible & Tract Soc'y of

New York, Inc. v. Village of Stratton, 536 U.S. 150 (2002) (reversing and remanding for

further proceedings where the Sixth Circuit rejected the argument that the law at issue

was overbroad, but neither commenting on, stating, nor limiting the overbreadth doctrine

to challenges based on a showing of expressive activity); City of Lakewood v. Plain

Dealer Publishing Co., 486 U.S. 750, 755-56 (1988), citing, Freedman v. Maryland, 380

U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one

has standing to challenge a statute on the ground that it delegates overly broad licensing

discretion to an administrative office, whether or not his conduct could be proscribed by a

properly drawn statute, and whether or not he had applied for a license") (emphasis

original); Board of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987)

(stating the overbreadth doctrine, but never mentioning a requirement that the

challenger's conduct be expressive); Shuttlesworth v. City of Birmingham, 394 U.S. 147,

153 (1969) (holding that a law granting unlimited authority to grant or withhold parade

permits would be unconstitutional on its face, but not limiting overbreadth challenges to

those plaintiff's who first demonstrate that their conduct is expressive). As the Supreme

Court has not so limited the overbreadth doctrine and long standing precedents makes it



expressly clear that the overbreadth doctrine allows the Plaintiff to facially challenge an overbroad regulation "even though its application in the case under consideration may be constitutionally unobjectionable," <u>Nationalist Movement</u>, 505 U.S. at 129, <u>citing</u>, <u>City Council of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. 789, 798-99 (1984); <u>Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.</u>, 482 U.S. 569, 574 (1987), the Plaintiff has standing to bring an overbreadth challenge.

Plaintiff's harm is also imminent. The constitutional requirement of standing has three elements: (1) "injury in fact," which is "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical"; (2) "causation," a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"; and (3) "redressibility," a "likelihood that the requested relief will redress the alleged injury." <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 103 (1998) (internal citations and quotations omitted). In the instant case, Plaintiff has suffered an injury in fact, the District has informed Plaintiff that it will enforce DC Official Code §25-374 (2001) against Plaintiff, which would require Plaintiff to move from the location in which it has done business since 1992 and only allow Plaintiff to transfer to a single zone within the District. <u>Exhibit 1</u>.  No other bar, club, or business selling alcohol has similar restrictions placed on them as does Plaintiff, whose business includes nude dancing.  Plaintiff's move from his business location is directly caused by the restriction at issue in this case.  Finally, a finding in Plaintiff's favor would address the harm caused by the regulation at issue.

Here Plaintiff specifically states in a declaration:

I, Warren Whitehead, am over 18 years of age, and I am the owner of Mystery Productions Entertainment, LLC, t/a Club Rendezvous at 2840 Alabama Avenue, S.E., Washington, DC 20020, declare as follows: I



have direct personal knowledge of the facts stated herein and would be competent to testify to same at trial. I am a holder of a Class "CN" retailer's license where nude dancing is permitted. This particular area where my club is located underwent eminent domain by the District of Columbia Government. I have been notified by D.C. Government Officials that the government plans to enforce DC Official Code §25-374 (2001), a zoning ordnance, against me. The alleged purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. Because of DC Official Code §25-374 (2001), there is only one location where I can move, if a location was available, and that is the central business district of the city. In real terms, the government enforcing DC Official Code §25-374 (2001) against my club means I will be out put out of business for one reason, because I have nude dancing. This law only applies to adult entertainment establishments. I am forced to leave an area that the club has been located in since 1992. I am in a predicament not of my own making. Simply because my license permits nude dancing, I am being treated differently, disadvantaged and not equal to a bar, nightclub, hip-hop club, a liquor store and/or a club that plays go-go music. They can move anywhere in the city but I cannot because my license (issued by the government) allows for non-obscene nude dance performances. This situation was created by the government not my actions. I declare under penalty of perjury that the foregoing is true and correct. <u>Exhibit 1</u>.

As Plaintiff's declaration makes clear, Plaintiff will suffer harm as a result of the instant regulation, simply by being forced to move from the location in which his business has been located for 15 years. <u>Id.</u>  Moreover, Plaintiff is further harmed by the limits placed on his move, leaving him only a single location in the District into which his business can be relocated, if at all. <u>Id.</u>  The District's regulation specifically targets adult entertainment and its speech, to the exclusion of all other businesses selling alcohol, which are not being subjected to such strict and limiting regulations. <u>Id.</u>  Furthermore, Plaintiff has standing to challenge the instant regulation as it is unconstitutional on its face because, despite the requirements needed to support such regulations, as detailed by the Supreme Court, the District has completely failed to conduct any studies regarding the secondary effects targeted by the instant regulation and/or how said regulation


created using BCL easyPDF Printer Driver  Click here to purchase a license to remove this image

addresses those secondary effects without unnecessarily chilling protected speech.
Alameda Books, Inc. v. City of Los Angeles, 535 U.S. 425 (2002).

Finally, the District has been less than truthful in arguing that this Court should abstain from hearing the instant case as the regulation at issue is subject to multiple interpretations, when in fact, the Alcohol Beverage Regulation Administration has already decided how DC OFFICIAL CODE §25-374 (2001) is to be interpreted regarding where affected business may transfer. See generally, Exhibit 2. In essence, ABRA has decided that affected businesses may only transfer into a district that is zoned exactly as the district from which they are relocating is zoned. Id. If the district into which a business seeks to transfer is not the same as the district from which the business is relocating, the transfer will be denied. See, Exhibit 3, ABRA Press Release dated April 19, 2007. The decision detailed in ABRA's April press release demonstrates that the District has already enforced this regulation against an adult entertainment venue and denied its application to relocate. Thus, enforcement against Plaintiff, which the District has already informed Plaintiff will take place, is imminent and will limit Plaintiff's ability to relocate to a single district, if Plaintiff is allowed to relocate at all.

Whether Plaintiff is ultimately allowed to transfer or not, does not cure the constitutional problems inherent in the instant regulation and the District has completely failed to address any of Plaintiff's arguments as they relate to the constitutionality of DC OFFICIAL CODE §25-374 (2001). Specifically, as the ABRA decision further illustrates, adult entertainment establishments are being treated differently than all other businesses licensed to sell alcohol simply because of the content of the speech promoted in such establishments and being allowed to transfer, if at all, only to the a district zoned

15


created using
BCL easyPDF
Printer Driver

the same as the district from which the business is relocating, no other type of business is subjected to such strict limitations.  It is important to note, that this Court denied Plaintiff's request for injunctive relief based solely on the basis of irreparable harm and did not state that Plaintiff's other arguments were without merit.  The denial of preliminary injunctive relief is not determinative of the ultimate issue in this case, the constitutionality of the District's regulation and thus, summary judgment must be denied.

Moreover, the Younger doctrine does not apply to the instant case, as there are not any parallel state proceedings currently pending. The <u>Younger</u> doctrine precludes federal court interference with state court proceedings.  <u>Younger v. Harris</u>, 401 U.S. 37, 43 (1971).  The doctrine does not apply in the case at bar because Plaintiff is not alleging any violations of state law, nor attempting to advance any state claims against Defendant. Simply put, the <u>Younger</u> doctrine does not apply because there are not any state proceedings in this case.  Interestingly, the District does not point to any pending state proceedings and even admits that there are not any state court proceedings related to the instant case currently pending.

Here, the Alcoholic Beverage Regulation Administration Board, faced with two interpretations of the instant regulation, decided on June 7, 2006, that an affected business could apply to relocate only to a district zoned identical to the district from which relocation was sought. <u>Exhibit 2</u>.   ABRA specifically stated that: " we conclude that DC Official Code § 25-374 (2001) allows the holders of a Class "CN" retailer's license with nude dancing approved by the Board to be located in a CM-1, CM-2, CM-3, or M zoned district to file an application to transfer its license to a corresponding CM-1, CM-2, CM-3, or M zoned district located in another part of the District of Columbia." <u>Id.</u>



ABRA went on to reiterate that §25-374(1) prohibits a license holder with nude dancing to relocate to within from another license holder with nude dancing. Id.  This restriction is only placed on adult entertainment and not on other businesses licensed to sell alcoholic beverages in violation of the Equal Protection Clause of the Fourteenth Amendment.

The instant case does not meet any of the three Younger criteria, which include: 1) an ongoing state proceeding; 2) the state court is an adequate forum; and 3) the state proceedings involve important state interests.  This case fails on the first point – there is not any ongoing state proceeding, as discussed above, ABRA has already decided which interpretation of the instant regulation will be implemented against affected businesses. This case also fails on the second point, state court is not an adequate forum for the case at bar, which centers solely around federal constitutional law.  The only question in this case is a federal question, which gives the federal court jurisdiction.  Accordingly, this Court must deny Defendant's instant motion.

**III.    DEFENDANT'S INSTANT MOTION MUST BE DENIED BECAUSE PLAINTIFF'S COMPLAINT SUFFICIENTLY DEMONSTRATES ITS ENTITLEMENT TO RELIEF.**

        **A.    Plaintiff has met the Pleading Standard Required by Federal Rule of Civil Procedure 8(a)(2), thus, this Court Must Deny Defendant's Instant Motion.**

Moreover, it is important to note that the Supreme Court recently made it abundantly clear that Federal Rule of Civil Procedure 8(a)(2) only requires that the Plaintiff provide "a short and plain statement of the claim showing that the [he] is entitled to relief." Swierkiewicz, 534 U.S. at 512.  Because the Plaintiff has provided this Court and the Defendant with "a short plain statement" illustrating its entitlement to the relief

17


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

requested granting Defendant's motion at this stage in litigation would allow Defendant, in practical terms, to circumvent the mandates espoused by a unanimous Supreme Court. Justice Thomas, writing for the Court, explained: "[t]his simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and dispose of unmeritorious claims." Swierkiewicz, 534 U.S. at 512.

The Court's rationale envisions a timeline, with a Plaintiff's requirement to meet notice pleading standards in the early stages, discovery in the middle stages up to and including depositions of plaintiffs and any motions for summary judgment once unmeritorious claims are evinced through fruitful discovery. Thus, summary judgment is unwarranted as the Plaintiff has met its pleading burden and discovery must be conducted to determine whether or not the District has carried its constitutional burdens in relation to the restrictions placed on adult entertainment businesses. See generally, Swierkiewicz, 534 U.S. 506.

Specifically, Alameda Books, Inc. v. City of Los Angeles, 535 U.S. 425 (2002), details the proof required to demonstrate the connection between the interests the District purports to be furthering and the speech that its regulations affect. In Alameda, the City of Los Angeles enacted an ordinance that prohibited adult businesses from being located within 1,000 feet of each other or within 50 feet of a religious institution, school, or public park. Id. at 430. Justice O'Connor, in the plurality opinion, stated that the City of Los Angeles did not have to "prove its theory about a concentration of adult operations attracting crowds of customers." Id. at 437. The plurality reiterated the holding in Renton that "a municipality may rely on any evidence that is 'reasonably believed to be relevant'

18



for demonstrating a connection between speech and a substantial, independent government interest." Id. at 438; Renton, 475 U.S. at 51-52.  This, however, does not grant the municipality carte blanche to rely on "shoddy data or reasoning." Alameda, 535 U.S. at 438. The evidence relied upon by the municipality "must fairly support [the] rationale for the ordinance." Id.

The District is obligated to demonstrate that DC OFFICIAL CODE §25-374 (2001) is supported by evidence "'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." Id. at 438, quoting, Renton, 475 U.S. at 51-52; Exhibit 4, International Nite Life Enterprises, Inc. v. Jack Johnson, MJG-06-2581 at 30-33 (2007).  Justice Kennedy wrote separately, adding that, in addition to asking how much evidence is required to support the government's position, the proper inquiry is "what proposition does a city need to advance in order to sustain a secondary-effects ordinance?" Alameda, 535 U.S. at 449 (Kennedy, J., concurring in judgment). In Justice Kennedy's view, the proposition the District advances must have "the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." Id.  Here, only in allowing discovery will the Court be able to determine, if in fact, the District has conducted the necessary studies and/or compiled the type of evidence in support of its regulation contemplated by the Supreme Court in Alameda.  In the instant case, the District had an obligation, in light of Alameda, to ensure that its regulations met the standard espoused by the Supreme Court.  Only discovery will determine if the District has carried its burden.



The District cannot justify the suppression of speech based bald assertions that its intent is to regulate secondary effects. There must be a connection between the "negative effects and the regulated speech" through the evidence produced by the District. R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 408 (7th Cir. 2004). As noted by Justice Kennedy, "the necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances . . . may reduce costs of secondary effects without substantially reducing speech." Alameda, 535 U.S. at 450. The District has not done any studies, nor did the District even acknowledge Alameda in its instant Motion.

Moreover, §25-374(1) prohibits a license holder with nude dancing to relocate to within from another license holder with nude dancing. Id. This restriction is only placed on adult entertainment and not on other businesses licensed to sell alcoholic beverages. Not only is §25-374 violative of the Equal Protection Clause as it intentionally discriminates against adult entertainment establishments, said restriction is arbitrary and not based on any studies or other relevant evidence which could support the notion that prohibiting adult entertainment venues within 600 feet of each other has any rational relation to the District's proposed interests as allegedly addressed by §25-374. Specifically, there is not any evidence in the administrative record accompanying §25-374 which could support such a notion and such evidence must be present in the administrative record. It is well established law that proceedings can be reviewed only by the evidence that is present on the record. Overton Park v. Volpe, 401 U.S. 402, 419 (1971). Where the District's post-hac attempts at rationalizing the instant regulations are not supported by the administrative and/or legislative record, such rationalizations are an inadequate basis for review where they are not supported by the record. Id.



Because Plaintiff has pled sufficient facts to meet its pleading burden according to Fed. R. Civ. P. 8(a)(2) and discovery has not yet been conducted as to whether or not the District has met its constitutional burdens, summary judgment must be denied in the instant case. See generally, Swierkiewicz, 534 U.S. 506.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment.

Respectfully submitted,

_____

Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623 (Fax)
Counsel for the Plaintiff
Bar No. MD 14639

_____

Janelle N. Richards, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623 (Fax)
Counsel for the Plaintiff
Bar No. MD 16520



created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

## <u>DECLARATION OF WARREN WHITEHEAD</u>

I, Warren Whitehead, am over 18 years of age, and I am the owner of Mystery Productions Entertainment, LLC, t/a Club Rendezvous at 2840 Alabama Avenue, S.E., Washington, DC 20020, declare as follows:

I have direct personal knowledge of the facts stated herein and would be competent to testify to same at trial.

I am a holder of a Class "CN" retailer's license where nude dancing is permitted. This particular area where my club is located underwent eminent domain by the District of Columbia Government. I have been notified by D.C. Government Officials that the government plans to enforce DC Official Code §25-374 (2001), a zoning ordnance, against me. The alleged purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. Because of DC Official Code §25-374 (2001), there is only one location where I can move, if a location was available, and that is the central business district of the city. In real terms, the government enforcing DC Official Code §25-374 (2001) against my club means I will be out put out of business for one reason, because I have nude dancing. This law only applies to adult entertainment establishments.

I am forced to leave an area that the club has been located in since 1992. I am in a predicament not of my own making. Simply because my license permits nude dancing, I am be treated differently, disadvantaged and not equal to a bar, nightclub, hip-hop club, a liquor store and/or a club that plays violent go-go music. They can move anywhere in the city but I cannot because my license (issued by the government) allows for non-obscene nude dance performances. This situation was created by the government not my actions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:      Washington,  DC
               April 17, 2007

_____
            Warren Whitehead

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## ALCOHOLIC BEVERAGE REGULATION ADMINISTRATION



June 7, 2006

The Honorable Jim Graham
Chairperson
Committee on Consumer & Regulatory Affairs
Council of the District of Columbia
1350 Pennsylvania Avenue, NW
Suite 105
Washington, DC 20004

Re:   Request for Advisory Opinion Interpreting D.C. Official Code § 25-374

Dear Councilmember Graham:

This responds to your written request to the Alcoholic Beverage Control Board (Board) dated June 2, 2006 in which you ask the Board for an advisory opinion regarding whether D.C. Official Code § 25-374 (2001), permits the holder of a Class "CN" retailer's license with nude dancing, currently located in a CM or M-zoned district, to relocate to the same CM or M-zoned district in another part of the District of Columbia. The Board considered your request at its June 7, 2006 meeting and has decided to issue this advisory opinion, pursuant to Section 1902.1 of Title 23 of the District of Columbia Municipal Regulations (DCMR) (2004), because the Board believes that the language contained in D.C. Official Code § 25-374 (2001), as it relates to your question, is not sufficiently clear to enable Advisory Neighborhood Commissioners ("ANC"), prospective licensees, or members of the public to determine where in the District of Columbia the holder of a Class "CN" retailer's license with nude dancing is permitted to file a transfer application.  In deciding to issue this advisory opinion, the Board notes that the legal question you have raised is not currently an issue in any contested case before the Board.

The possible locations in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing may file an application to transfer its license are contained in D.C Official Code § 25-374 (2001).  This provision states in relevant part as follows:

> "A license under § 25-371(b) may only be transferred to a location in
> the Central Business District or if the licensee is currently located
> in a CM or M-zoned district, transferred within the same CM or
> M-zoned district as identified in the zoning regulations of the District
> of Columbia and shown in the official atlases of the Zoning Commission
> of the District of Columbia . . . ." (Emphasis added).

Whether this provision allows the holder of a Class "CN" retailer's license with nude dancing, currently located in a CM or M-zoned district, to file an application to relocate its license to an equivalent CM or M-zoned district in another part of the District of Columbia depends upon the proper interpretation of the word "same" in the phrase "transferred within the same CM or M-zoned district." Specifically, the Board finds in examining the plain meaning of the statute that there are two possible interpretations of the word "same" as used in this phrase.[1] First, the phrase "transferred within the same CM or M-zoned district" can be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing only within the specific boundaries of the particular CM or M-zoned district in which it is currently located. Under this interpretation, the holder of a Class "CN" retailer's license with nude dancing would be prohibited from filing a license application to move its license from its existing CM or M-zoned district to an identical CM or M-zoned district in another part of the District of Columbia. Alternatively, the Board finds that the phrase "transferred within the same CM or M-zoned district" can be interpreted to permit the filing of a transfer to a new location application by the holder of a Class "CN" retailer's license with nude dancing from its existing CM or M-zoned district to an identical or equivalent CM or M-zoned district in another part of the District of Columbia. Specifically, under this interpretation, the holder of a Class "CN" retailer's license located in a CM-1, CM-2, CM-3, or M-zoned district, as defined in Section 105.1 of Title 11 of the DCMR (Zoning Regulations) and contained in the zoning maps of the District of Columbia, would be allowed to file an application to transfer its license respectively to another CM-1, CM-2, CM-3, or M-zoned district. For example, the holder of a Class "CN" retailer's license with nude dancing approved by the Board to be located in a CM-2 zoned district would be permitted to file an application to transfer its license to another CM-2 zoned district located in another part of the District of Columbia.

While the Board finds both of these interpretations to be reasonable, the Board concludes that the second interpretation is preferable for two major reasons. First, the Board believes that the second interpretation provides greater meaning to the Council of the District of Columbia's (Council) inclusion of the words "CM or M-zoned" in the phrase "transferred within the same CM or M-zoned district." Specifically, under the first interpretation, the words "CM or M-zoned" would be rendered insignificant and superfluous because the Council could have limited a nude dancing licensee to filing a transfer application within its existing CM or M-zoned district by providing simply that such a license could be transferred "only within its existing district" or "only within the same district." In contrast, the words "CM or M-zoned" are given meaning by the second interpretation that the Council intended to allow the holder of a Class "CN" retailer's license with nude dancing to file an application to transfer its license to an identical or equivalent CM or M-zoned District. Specifically, in this case the phrase "same CM or M-zoned district" is intended to designate the CM-1, CM-2, CM-3, and M-zoned districts contained in the zoning

---

[1] The Board finds the plain meaning of the language contained in D.C. Official Code § 25-374 (2001) to be inconclusive regarding this issue because the word "same" is commonly defined not only to mean things previously referred to, which lends support to the first interpretation, but also to mean similar in kind or identical, which lends support to the second interpretation. See WEBSTER'S NEW WORLD DICTIONARY 1258 (2ND ED. 1986). The Board did not find any specific legislative history regarding D.C. Official Code § 25-374 (2001) in the Draft Report on Bill 13-449, the Title 25, D.C. Code Enactment and Related Amendments Act of 2000, which was later enacted by the Council as part of D.C. Law 13-298, effective May 3, 2001.

2

regulations and the zoning maps of the District of Columbia that correspond to the particular district in which the licensee is currently located. Our adoption of this second interpretation of the statute is reinforced by the well-established canon of construction that statutes are to be construed in a manner that gives meaning to every word of the statute's text. See United States v. Menashe, 348 U.S. 528, 538-539 (U.S. 1955).

Second, although the Board did not find any legislative history on this provision in the Bill's Committee Report, the Board believes that the public policy objectives of D.C. Official Code § 25-374 (2001) are better supported by the second interpretation. The purpose of this statute is to identify those areas in the District of Columbia where the holder of a Class "CN" retailer's license with nude dancing is permitted to transfer its license. The Council decided to permit Class "CN" retailer's licenses with nude dancing to be transferred only to the Central Business District or to the CM or M-zoned industrial districts -- zoning areas that are generally less likely compared to other zoning districts to be located in close proximity to residential communities. The same objective -- ensuring that licensees with nude dancing are restricted to locations distant from residential neighborhoods -- appears in D.C. Official Code § 25-374(2) (2001), which prohibits the transfer of a Class "CN" retailer's license with nude dancing within six hundred feet from a building with either: (1) a certificate of occupancy for residential use or (2) a permit for residential construction at the premises. In enacting D.C. Official Code § 25-374 (2001) there is nothing to suggest -- as would be the case in adopting the first interpretation -- that the Council believed that each specific CM or M-zoned district contained unique characteristics that differentiated it from all corresponding CM or M-zoned districts and warranted preventing the holder of a Class "CN" retailer's license from moving to an identical or similar CM or M-zoned district located in another part of the District of Columbia. To the contrary, a review of Chapter 8 (Industrial Districts) of Title 11 of the DCMR supports the second interpretation because it reveals that CM-1, CM-2, CM-3, and M-zoned districts share similar characteristics with other CM-1, CM-2, CM-3, and M-zoned districts throughout the District of Columbia, including specific height limitations and maximum floor area ratios. (See 11 DCMR §§ 840 and 841.)

Accordingly, we conclude that D.C. Official Code § 25-374 (2001) allows the holder of a Class "CN" retailer's license with nude dancing approved by the Board to be located in a CM-1, CM-2, CM-3, or M-zoned district to file an application to transfer its license to a corresponding CM-1, CM-2, CM-3, or M-zoned district located in another part of the District of Columbia. However, please be advised that D.C. Official Code § 25-374(1) (2001) prohibits the filing of an application to transfer a Class "CN" retailer's license with nude dancing within six hundred feet of another Class "CN" retailer's license with nude dancing. Additionally, as stated above, D.C. Official Code § 25-374(2) (2001) prohibits the filing of an application to transfer a Class "CN" retailer's license within six hundred feet from a building with either: (1) a certificate of occupancy for residential use or (2) a permit for residential construction at the premises. Furthermore, you should be aware that the filing of a transfer to a new location application is subject to the community protest process with notice provided to members of the public, including all Advisory Neighborhood Commissions, located within six hundred feet of any proposed location.

The Board believes this advisory opinion is of interest to the public and is publishing this advisory opinion in the D.C. Register, as permitted by 23 DCMR § 1902.7 (2004). Because this is not a contested case, nothing in this advisory opinion shall be construed as waiving any party's right to raise any legal arguments regarding this issue in any future Board proceeding.

Sincerely,

Charles A. Burger
Chairperson
Alcoholic Beverage Control Board
On behalf the Alcoholic Beverage Control Board

4

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
ALCOHOLIC BEVERAGE REGULATION ADMINISTRATION



**For Immediate Release**

### ABC Board Denies Nude Dancing License Application; Refers matter to DC Council for Legislative Action

**April 19, 2007**

**Today the Alcoholic Beverage Control (ABC) Board voted 4 to 2 to deny the nude dancing license application of Capitol Hill Cabaret, t/a Edge Wet to transfer its liquor license to the Ivy City neighborhood concluding that the current laws and regulations of the District of Columbia do not permit the transfer. The Board, in its entirety, stated that it is sympathetic to the transfer of nightclub licenses held by the owners and businesses who have been displaced by or located near the construction of the baseball stadium, but it was the Board's decision, which was clearly set out in a prior letter of notification to the Council on June 7, 2006, that the transfer of license can only occur in an identical CM (Commercial-Light Manufacturing District) zoned district (i.e. CM2 to a CM2, not a CM2 to a CM1) under existing law.**

**Today's vote is a reaffirmation of its June 7, 2006 advisory opinion to the Council which clearly indicated that the license transfer application of a nude dancing establishment from a CM2 to a CM1 zoned district is not permitted. As part of the Board's decision it requested that the Council review this issue in light of the displacement and relocation of these licensees.**

**In making its decision, the ABC Board majority concluded: "As a regulatory body, we cannot and should not be making policy decisions. That is best left to the elected officials of the District of Columbia and we request the Council to take this matter up expeditiously."**

**For more information, please contact Fred Moosally, ABRA General Counsel at (202) 442-4355, or Jennifer Johnson, Assistant Attorney General at (202) 442-4468.**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WET SANDS, INC., et al.            *

        Plaintiffs                 *

             vs.                   *    CIVIL ACTION NO. MJG-06-2243

PRINCE GEORGE'S COUNTY, MARYLAND*

        Defendant                  *

*       *       *       *          *       *       *       *       *

INTERNATIONAL NITE LIFE           *
 ENTERPRISES, INC.
                                   *
             vs.                        CIVIL ACTION NO. MJG-06-2581
                                   *
JACK JOHNSON, et al.
                                   *
        Defendants
*       *       *       *          *       *       *       *       *

<u>MEMORANDUM OF DECISION</u>

These cases, consolidated for trial, were tried to the Court without a jury.  The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.  The facts set forth herein are found based upon the Court's evaluation of the evidence and the reasonable inferences derived therefrom.


I.   <u>BACKGROUND</u>

     A.   <u>Parties</u>

     Plaintiffs Wet Sands, Inc. ("Wet Sands"), CD15CL2001, Inc. ("CD"), Nico Enterprises, Inc. ("Nico"), and International Nite Life Enterprises, Inc. ("Nite Life") are Maryland Corporations that, at all times relevant hereto, have provided nude or semi-

nude dancing in Prince George's County, Maryland.[1]  The sole
Defendant at trial[2] was Prince George's County, Maryland
(hereinafter "the County").

The adult entertainment provided by Plaintiffs herein
includes entertainers[3] performing dances on a stage while nude or
scantily attired.  There is physical contact or proximity between
customers and entertainers during the stage dancing if customers
approach - or touch - the dancers while giving tips.  Plaintiffs
also permit customers to have female entertainers perform "lap
dances" in which a female entertainer moves on a male customer's
lap.  Plaintiffs extensively monitor physical contact between
patrons and entertainers to prevent overt sexual activity and
other intimacies.

Plaintiffs (and others in the same business) typically
generate revenue by charging admission,[4] selling beverages
(including alcoholic beverages if licensed to do so), selling of
some edibles[5] and charging fees for lap dances.  The entertainers

---

[1]  "John Doe" and "Jane Doe" plaintiffs, identified as
representative patrons of the corporate Plaintiffs'
establishments by Wet Sands, CD and Nico, have not participated
actively in the proceeding and are assumed to lack standing
herein.

[2]  Nite Life sued Defendant Jack Johnson, but stipulated to
the dismissal of all claims against him.  [Paper 19]

[3]  Most of the businesses provide female dancers; Wet Sands
provides male, not female, dancers.

[4]  The admission charge is sometimes euphemistically
expressed as a membership fee or the like.

[5]  Typically, chips, pretzels and the equivalent.

2

are typically not paid by the business.  Indeed, the entertainers normally pay the business a fee for the privilege of entertaining and earning tips that, it appears, can amount to considerable sums in the course of an evening.

      B.   <u>The Legislation</u>

On July 18, 2006, the County Council of Prince George's County ("the Council") enacted CB-31-2006 ("CB-31"), a zoning regulation that granted the Prince George's County Police and Fire Chiefs the power to require operators to cease and desist the operation of activities that are dangerous to the public health or safety, or being conducted without a premises license.

On the same date, the Council enacted CB-61-2006 ("CB-61"), an ordinance that established conduct restrictions and licensing requirements for "adult entertainment" businesses.

As discussed more fully herein, CB-61 places certain conduct restrictions on adult entertainment premises, providing, <u>inter alia</u>, that any nude dancer must perform on a stage raised at least eighteen inches off of the ground six feet away from all patrons.  Contact between certain specified anatomical areas of performers and patrons is prohibited, as is providing a gratuity while performances are ongoing.  CB-61 also requires an adult entertainment business to obtain a license and meet specified safety standards.  The ordinance further requires the licensing of managers and entertainers working in the business.

3

C.  <u>Procedural Background</u>

Wet Sands, CD, and Nico filed suit against the County on August 29, 2006.  They contend that CB-31 and CB-61 violate the United States Constitution's First Amendment, the Takings and Due Process Clauses of the Fifth Amendment, and the Equal Protection Clause of the Fourteenth Amendment as well as the Maryland Declaration of Rights.  They further claim that the aforesaid provisions are unconstitutionally vague and overbroad.  They requested a declaratory judgment, as well as preliminary and permanent injunctive relief against the enforcement of CB-31 and CB-61.  On September 15, 2006, Judge Chasanow,[6] deferred ruling on a request for a broad restraint against the legislation, but preliminarily enjoined enforcement of the provision in CB-61 requiring the public posting of licenses required thereunder.  Hr'g. Tr.[7] 102, 104-05.

Nite Life filed suit on October 5, 2006 presenting essentially the same contentions with regard to CB-61.[8]

On October 5, 2006, these cases were transferred to the undersigned Judge.  On October 18, 2006, this Court issued a Preliminary Injunction providing that, by agreement of the parties, Prince George's County would not take action to enforce CB-61 until the conclusion of the trial.

---

[6]  To whom the case was then assigned.

[7]  References to "Hr'g Tr." are to the transcript of the September 15, 2006 hearing before Judge Chasanow.

[8]  Nite Life does not present any claim with regard to CB-31.

4

The cases were tried in a consolidated proceeding on
November 20 and 21, 2006.  Thereafter, a hearing was held and
counsel presented post-trial arguments.


II.   <u>DISCUSSION</u>

     A.   <u>CB-31 (Zoning)</u>

     Wet Sands, CD, and Nico present an "as-applied facial
challenge" to CB-31, contending that, although CB-31 is a
generally applicable health and safety law that is neutral on its
face, it is unconstitutional "as applied to First Amendment forms
of businesses."  Pl.'s Pretrial Mem. [Paper 30] at 8.  The
essence of the argument is that CB-31 affords Prince George's
County officials "unbridled discretion" that they <u>could</u> use
unconstitutionally to censor speech (including expressive
conduct) of which they disapprove.

     On its face, CB-31 does not differentiate between adult
entertainment establishments and other businesses.  The law
allows the Chiefs of the Police and Fire Departments to force the
closure of any type of business or activity if a use and
occupancy permit is lacking, or if the activity presents an
immediate danger to public health or safety.  CB-31, §§ 27-260,
27-264.01.  Should a business be closed by virtue of this
authority, a Zoning Hearing Examiner must hold a hearing within
four days on the validity of the closing, and must render a
decision two days after the hearing.  <u>Id.</u> §§ 27-264.01 (d), (g).

Decisions of the Zoning Hearing Examiner may be appealed to the
Circuit Court for Prince George's County.  Id. § 27-264.01(i).

Wet Sands, CD, and Nico rely primarily on Lady J Lingerie v.
City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999), wherein the
city of Jacksonville enacted zoning laws that allowed adult
entertainment establishments to operate as of right in just one
area of the city.  Id. at 1361.  Moreover, the legislation
further required that an adult entertainment establishment be
located a specified distance from other such businesses.  As a
practical matter, only two limited areas remained available for
adult entertainment businesses within the permissible zone.  Id.
Adult entertainment businesses could apply for a zoning exception
that would permit them to operate in a second zone of the city.
Id.  However, the approval of applications for this exception was
subject to the discretion of the zoning board, guided only by
nebulous standards such as "compatibility" or "environmental
considerations."  Id. at 1362.

The Eleventh Circuit held that this "unbridled discretion"
did not pass constitutional muster because the zoning board's
decision was not subject to "precise and objective" criteria.
Id.  Due to the danger that this broad discretion could be use
to stifle certain forms of expression, the court held that the
subjective zoning exception criteria could not be used with
regard to applicants whose businesses are entitled to First
Amendment protection.  Id.

6

The decision in <u>Lady J Lingerie</u> concerned legislation that, unlike CB-31, subjected adult entertainment businesses to standards different from those applicable to other businesses. These businesses were relegated to accepting a location in a part of a small zone in Jacksonville or being subject to the vagaries of a zoning board exception application process.  In sharp contrast, CB-31 makes no distinction between types of businesses. It does not disadvantage businesses - such as Plaintiffs' - that would be subject to First Amendment Protection.

Furthermore, CB-31 allows closure of any business only if that business has violated certain county safety codes or failed to obtain a use and occupancy permit.  The closure can then be appealed to the Zoning Hearing Examiner and heard within four days; a decision must follow two days later.  A dissatisfied party may appeal the decision of the Zoning Hearing Examiner to the Circuit Court for Prince George's County.  Thus, there is rapid administrative review and prompt access to the courts for any business closed pursuant to CB-31.

Of course, as Judge Chasanow noted in her ruling in regard to preliminary relief, should CB-31 be implemented in a manner that discriminates against adult entertainment establishments, Plaintiffs (or any other affected person) may present an "as-applied" challenge to CB-31.  Hr'g. Tr. 104.  However, the instant case does not present any such challenge.

In sum, CB-31 does not distinguish between types of businesses, provides for prompt administrative and judicial

7

review of any closure and, therefore, is not unconstitutional on
its face as violative of Plaintiffs' First Amendment freedoms.


### B.   CB-61 (Conduct Restrictions and Licensing)

CB-61 includes conduct restrictions and a licensing scheme.


#### 1.   The Conduct Restrictions

##### a.   The Restrictions at Issue

CB-61 includes provisions prohibiting minors' access to the
premises (§ 2613), preventing entertainers from being visible
from any public place while employed on the premises
(§ 2609(a)(8)), prohibiting operation of the adult entertainment
business from 1 a.m. to 10 a.m. (§ 2612), and imposing certain
restrictions on the conduct of the business (§ 2609(a)(1)-(7),
(9)-(11).

Plaintiffs do not raise any objection to the prohibitions
relating to access to minors or public visibility of
entertainers. Nor do they raise any objection to several safety
provisions in CB-61.[9]  Moreover, Plaintiffs concede that some
restriction on the hours of operation would be acceptable, but
argue that the hours restrictions on their clients must be
reasonable.

Accordingly, the term "conduct restrictions" is utilized
herein to refer to CB-61-2006 §§ 5-2609(a)(1)-(7) and (a)(9)-
(11), but not §§ 5-2609(a)(8), 5-2609(b), 5-2612 and 5-2613.

---

[9]   See § 5-2609(b).

8

The conduct restrictions require that employees who are nude, semi-nude, or simulating any state of nudity be separated from the patrons.  To accomplish this result, the legislation provides:

> (1) No employee or entertainer shall be unclothed, clothed in less than opaque attire, or shall move or remove such attire, or allow such attire to be moved or removed so as to expose to view any portion of the breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals, except upon a stage at least eighteen inches (18") above the immediate floor level and removed at least six feet (6') from the nearest patron.

> * * *

> (3) No employee or entertainer mingling with the patrons shall be unclothed or clothed in less than opaque and complete attire, costume or clothing as described in Section [5-2609](a) of this Section.

> * * *

> (6) No employee or entertainer shall wear or use any device or covering exposed view which simulates the breast below the top of the areola, vulva or genitals, anus, buttocks, or any portion of the pubic region.

CB-61, §§ 5-2609(a)(1), (a)(3), (a)(6).  Accordingly, nudity[10] is not banned in adult entertainment establishments, so long as each nude entertainer is on a stage eighteen inches higher than the patron floor level and no patron is within six feet of a nude entertainer.

CB-61 provides further that:

---

[10]  The terms "nude," "nudity," etc. are used herein to refer to the state of "nudity" defined in CB-61.

9

(2) No employee or entertainer shall perform acts of or acts which simulate:

   (A) Sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, or any sexual acts which are prohibited by law;

   (B) The touching caressing or fondling of the breasts, buttocks or genitals; or

   (C) The displaying of the pubic region, anus, vulva or genitals; except as provided for in Subsection (a) of this Section.

*   *   *

(4) No employee or entertainer shall knowingly:

   (A) Touch, caress or fondle the breast, buttocks, anus, genitals or pubic region of another person; or

   (B) Permit the touching, caressing or fondling of his or her own breasts, buttocks, anus genitals or pubic region by another person; or

   (C) Permit any person upon the premises to touch, caress, or fondle the breasts, buttocks, anus, genitals or pubic region of another person.

(5) No manager shall knowingly permit any person upon the premises to touch, caress, or fondle the breasts, buttocks, anus, genitals or pubic region of another person.

*   *   *

(7) No employee or entertainer shall use artificial devices or inanimate objects to depict any of the prohibited activities described in this section.

*   *   *

(9) No entertainer shall solicit, demand or receive any payment or gratuity from any patron for any act prohibited by this chapter.

(10) No entertainer shall demand or collect any payment or gratuity from any patron for entertainment before its completion.

10

Id. §§ 5-2609(a)(4)-(5), (a)(7), (a)(9)-(11).

These provisions prohibit entertainers from touching themselves or others in certain parts of the body, from performing sexual acts and from engaging in, or simulating, sexual conduct.  Moreover, patrons are prohibited from tipping the entertainers during a performance.  Furthermore, the establishment must conspicuously display a sign stating the existence of certain of the conduct restrictions.

However, CB-61 contains a critical provision (the "Savings Clause") that limits the applicability of the foregoing conduct restrictions to obscene behavior.

### b.    The Savings Clause

The Savings Clause of CB-61 provides:

(c) This Division shall not be construed to prohibit protected expression, such as:

    (1) Plays, operas, musicals, or other dramatic works that are not obscene;

    (2) Classes, seminars and lectures held for serious scientific or educational purposes that are not obscene; or

    (3) Exhibitions, performances, expressions or dances that are not obscene.

(d) For purposes of this Division, an activity is "obscene" if:

    (1) Taken as a whole by an average person applying contemporary community standards the activity appeals to a prurient interest in sex;

    (2) The activity depicts patently offensive representations, as measured against the community standards, of:

> (A) Ultimate sexual acts, normal or
> perverted, actual or simulated; or
>
> (B) Masturbation, fellatio, cunnilingus,
> bestiality, excretory function, or lewd
> exhibition of the genital areas; or violent
> or destructive sexual acts, including but not
> limited to human or animal mutilation,
> dismemberment, rape or torture; and
>
> (3) The activity taken as a whole lacks serious
> literary, artistic, political, or scientific
> value.

Id. § 5-2609 (emphasis added).

In view of the Savings Clause, the only restriction upon the expressive conduct aspect of Plaintiffs' business imposed by CB-61 is a prohibition against performances that are "obscene."  The Savings Clause defines "obscene" in accordance with the Supreme Court's definition in Miller v. California, 413 U.S. 15, 24 (1973).  Accordingly, except to the extent that such action may be found to constitute "obscenity" under Constitutionally acceptable standards, CB-61 does not restrict "nude" dancing or lap dancing, regardless of stage height, patron proximity or physical contact.

Of course, any conduct that constitutes "obscenity" under the Miller test can properly be prohibited under the legislation because there is no First Amendment protection for such conduct.

In sum, the Savings Clause performs its stated function; it saves the conduct restrictions of CB-61 from constitutional challenge.

c.    Equal Protection

12

Nite Life[11] contends that CB-61 denies it the equal protection of the law because it distinguishes between "for-profit" and "non-profit" businesses on its face. Specifically, Nite Life points to the Public Indecency provision of CB-61 that prohibits persons from engaging in sexual intercourse or appearing in a state of nudity "in a public place or in a place open to the public." CB-61, § 14-139.02. CB-61 defines "place open to the public" as "any privately-owned place of business operated for a profit to which the public is invited." § 1-102(25.1) (emphasis added). Nite Life argues that CB-61 thus allows sexual intercourse or nudity in a place that is open to the public but not operated for a profit, creating an unconstitutional distinction between the two. However, § 14-139.02 prohibits nudity and sexual intercourse not only in any "place open to the public," but also in any "public place." The term "public place" is defined by CB-61 as including "any . . . place [whether or not operated for a profit] commonly open to the public." § 1-102(25.1). Therefore, the nudity prohibition in CB-61 does not distinguish between for-profit and non-profit operations; there is no Equal Protection clause violation.[12]

### d. Vagueness

---

[11] The other Plaintiffs do not present this contention.

[12] It may be true that a for-profit business is subject to the ban under two separate provisions while a not for profit operation is subject tot the ban by only one. However, since both types of operations are subject to the very same treatment, there is no equal protection violation.

Statutory language is void for vagueness if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct" the statute prohibits, or if "it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000).

Plaintiffs argue that CB-61 is void because it is unconstitutionally vague.  Plaintiffs do not specify what parts of the ordinance they contend are impermissibly vague, but generally refer to the Middle District of North Carolina's holding in Giovani Carandola, Ltd. v. Fox that the terms "fondle" and "simulate" (both used in CB-61) were unconstitutionally vague.  396 F. Supp. 2d 630, 660 (M.D.N.C. 2005)(hereinafter "Carandola I"), rev'd in part, Carandola v. Fox, No. 05-2308, slip. op. (4th Cir. December 15, 2006) (hereinafter "Carandola II").

Like the North Carolina statute at issue in Carandola I, CB-61 prohibits an entertainer in an adult entertainment establishment from performing, inter alia, "acts which simulate" sexual intercourse, masturbation, and sodomy.  CB-61, § 5-2609(a)(2).  Additionally, entertainers cannot perform or simulate the "touching, caressing or fondling of the breasts, buttocks or genitals."  Id.; see id. §§ 5-2609(a)(4), (a)(5).

In Carandola II, the Fourth Circuit held that the verb "'simulate' is sufficiently precise to notify persons of ordinary intelligence of the conduct prohibited by the statute and to prevent the risk of arbitrary or discriminatory enforcement."

14

Carandola II, No. 05-2308, slip. op. at 8.  "An act only constitutes simulated sexual intercourse or simulated masturbation if it creates the realistic impression of an actual act."  Id. at 9 (emphasis in original).  Moreover, the verb "fondle" is "sufficiently clear to put persons of ordinary intelligence on notice as to what conduct the statute prohibits and to prevent the risk of arbitrary enforcement.  Id. at 9-10. The Fourth Circuit noted that the term "fondling" occurred only in conjunction with a "specified erogenous zone, indicating that it aims to prevent overt sexual conduct."  Id. at 9.

In light of Carandola II, the Court must hold that CB-61 is not void for vagueness.


### e.   Overbreadth

Plaintiffs claim that CB-61 is unconstitutionally overbroad because it "reaches a substantial number of impermissible applications."  New York v. Ferber, 458 U.S. 747, 771 (1982). However, when legislation limits conduct and not just speech, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973).  Should a statute suffer the overbreadth infirmity, any enforcement is totally forbidden.  Id. at 613.  Therefore, the Supreme Court has warned that the overbreadth doctrine is "strong medicine" that should be used "sparingly and only as a last resort."  Id.

15

Plaintiffs challenge the prohibition in CB-61 against the
simulation of certain sexual acts.  CB-61, § 5-260(a).  However,
in Carandola II the court held that essentially identical
language was not overbroad because the prohibition on simulated
sexual acts did not apply "when the performances that are
presented are expressing matters of serious literary, artistic,
scientific, or political value."  Carandola II, No. 05-2308,
slip. op. at 6.  The Savings Clause in CB-61 has the same effect
as the exception in the Carandola II legislation and saves CB-61
from being unconstitutionally vague.

### f.    Hours of Operation

Plaintiffs do not challenge the existence of a restriction
on hours of operation in CB-61.  They contend, however, that any
restriction on the hours of operation of their businesses must be
reasonable and that it is fundamentally unfair to impose upon
their providing of adult entertainment more stringent hours of
operation than those imposed on businesses selling alcoholic
beverages with (or without) other types of entertainment.

The ordinance requires that adult entertainment businesses
operate only between the hours of 10:00 a.m. and 1:00 a.m.  CB-
61, § 2612.  However, businesses that serve alcohol in Prince
George's County may operate, with limited exceptions, between
6:00 a.m. and 2:00 a.m.  Thus, an adult entertainment business
with a liquor license may continue to serve alcohol until 2 a.m.
but at 1 a.m. must cease its adult entertainment.

16

The County has presented nothing whatsoever to support a
conclusion that any secondary effects of adult entertainment - as
distinct from other types of entertainment - require or even
warrant an earlier closing time than business that provide
alcoholic beverages.  On the other hand, the Court finds - as
Plaintiffs conceded - that it is appropriate to impose reasonable
restrictions on their hours of operation.  The Court finds that,
on the record in the instant cases, the County's adoption of an
hours of operation restriction on all places that serve alcohol
without regard to the content or absence of entertainment
provides an adequate basis for the adoption of the same
restrictions on adult entertainment businesses.

Accordingly, the hours of operation restrictions in CB-61
are facially valid and enforceable, but only to the extent of the
generally applicable restrictions imposed on businesses that are
licensed to sell alcoholic beverages.

## g. Sign Posting

The sign posting provision of CB-61 shall be treated
consistently with the decision regarding the substance of the
items required to be stated thereon.  Accordingly, § 5-
2609(a)(11) is held facially valid and enforceable only with
regard to the requirement that there be a sign stating that the
premises are licensed and that entertainers are not permitted to
engage in any type of sexual conduct.

17

2. <u>The Licensing Scheme</u>[13]

CB-61 provides that an individual who desires to operate or work in an "adult entertainment premises" as a manager or entertainer must obtain a license before doing so. CB-61, §§ 5-2602 - 5-2603.

"Adult entertainment" is defined as:

any exhibition, performance or dance of any type conducted in a premises where such exhibition, performance or dance involves a person who:

(1) is unclothed or such attire, costume or clothing as to expose to view any portion of the breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals; or

(2) touches, caresses or fondles the breasts, buttocks, anus, genitals or pubic region of another person, or permits the touching, caressing or fondling of his/her own breasts, buttocks, anus, genitals or pubic region by another person, with the intent to sexually arouse or excite another person.

<u>Id.</u> § 5-2601(a).

"Adult entertainment premises" are "any premises to which the public, patrons or members are invited or admitted and wherein an entertainer provides adult entertainment to a member of the public, a patron, or a member." <u>Id.</u> § 5-2601(b). To obtain an "adult entertainment premises license," an applicant must submit personal biographical data, the names and biographical data of all business partners and corporate officers and directors, a description of the adult entertainment business

---

[13] The licensing scheme is contained in CB-61 §§ 5-2602 - 5-2608, 5-2610 - 5-2611, 5-2614 - 5-2616.

18

history of the applicant, and a description of the employment of the applicant for the three previous years.[14]  Id. § 5-2605(a). Applicants for a premises license must also submit with their application proposed plans for security, traffic management and parking, a parking lot lighting plan, and a proposed life safety evaluation of the space in which the performance will be held, if the occupancy exceeds 250 persons.  Id. § 5-2606.

Managers and entertainers applying for a license must provide biographical information, as well as the name of any business where the applicant intends to work and proof that the applicant is at least eighteen years old.  Id. § 5-2605(b).

Within five days of receipt of a completed application, the Chief of Police "shall issue the applicable license," so long as the building in which the entertainment will occur has all required licenses, the applicants and all agents or employees have made no false statements, and all parties involved are at least eighteen years of age.  Id. § 5-2608.  Should the Chief deny an application, the aggrieved party may appeal the adverse decision to the Price George's County Board of Administrative Appeals, and then to the Circuit Court for Prince George's County, should the first appeal not succeed. Id. §§ 5-2608, 5-2615 - 5-2616.

---

[14]  Biographical data includes an applicant's address, telephone number, and date and place of birth. CB-61, § 5-2605(a)(1).  The applicant must also give addresses for the previous five years.  Id. § 5-2605(a)(4).  With regard to business history, the applicant must report the suspension or revocation of any other business licenses in the past.  Id. § 5-2605(a)(5).

Once a club is fully licensed and operational, the licenses of the owner, managers and entertainers must be posted in a place that is readily available for inspection.  <u>Id.</u> § 5-2610. Additionally, the manager is required to maintain a log of all entertainers and managers working at the club each day.  <u>Id.</u>  A licensed manager must be present at all times the club is in operation.  <u>Id.</u> § 5-2611.

The Chief of Police may close the club if there are violations of any part of CB-61.  The Police Chief's closure decision may be appealed in the same manner as a denial of a license.  <u>Id.</u> §§ 5-2614 - 5-2616.

a.  <u>First Amendment Protection of Sexually Oriented Businesses</u>

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech."  U.S. Const., Amend. I.  The Free Speech Clause of the First Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment.  <u>Gitlow v. New York</u>, 268 U.S. 652, 666 (1925).  The First Amendment "bars the government from dictating what we see or read or speak or hear."  <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234, 245 (2002).  Expressive conduct is protected by the First Amendment, but it enjoys less protection than does pure speech and restrictions on its exercise are more likely to be constitutionally permissible. See <u>e.g.</u>, <u>United States v. O'Brien</u>, 391 U.S. 367, 376 (1968).  Restrictions on expressive conduct are typically aimed at suppressing the secondary effects of the non-

20

expressive aspect of the conduct instead of the expression itself. <u>Steakhouse, Inc. v. City of Raleigh</u>, 166 F.3d 634 (4th Cir. 1999).

Sexual expression which is "indecent but not obscene is protected by the First Amendment." <u>Reno v. ACLU</u>, 521 U.S. 844, 874 (1997). Nude dancing such as the type at issue here can be protected expressive conduct, but the Supreme Court has stated that "customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression." <u>Barnes v. Glen Theatre, Inc.</u>, 501 U.S. 560, 564 (1991). As stated by Justice Stevens in <u>Young v. American Mini Theaters</u>, the First Amendment will not allow the total suppression of erotic expression, but "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate." 427 U.S. 50, 70 (1976).

Regulations enacted for the purpose of restraining speech due to the content of that speech presumptively violate the First Amendment. <u>Carey v. Brown</u>, 447 U.S. 455, 462-63, 463 n.7 (1980); <u>Police Dept. of Chicago v. Mosley</u>, 408 U.S. 92, 95 (1972). If Prince George's County's purpose in enacting the statutes in question is "related to the content of the expression," then it must be justified under the "more demanding" strict scrutiny, which few statutes survive. <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 289 (2000), <u>Texas v. Johnson</u>, 491 U.S. 397, 403 (1989). However, "if the governmental purpose in exacting the regulation is unrelated to the suppression of expression, then the

21

regulation need only satisfy the 'less stringent'" intermediate scrutiny.  <u>Pap's A.M.</u>, 529 U.S. at 289, <u>Johnson</u>, 491 U.S. at 403.

It is well established that a government may place restrictions on erotic expression if its goal is to prevent the deleterious secondary effects of the adult entertainment establishments, not suppress the erotic message.  <u>City of Los Angeles v. Alameda Books, Inc.</u>, 535 U.S. 425, 438 (2002) (stating that it is a "settled position" that municipalities must be able to address the secondary effects of protected speech); <u>Boos v. Barry</u>, 485 U.S. 312, 320 (1988) (<u>citing</u> <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 48 (1986)); <u>Giovani Carandola, Ltd. v. Bason</u>, 303 F.3d 507, 513 (4th Cir. 2002) (hereinafter cited as "<u>Bason</u>"); <u>Carandola II</u>, No. 05-2308, slip. op. at 11.  The Fourth Circuit stated in <u>Bason</u>:

> The Supreme Court has instructed that measures to regulate sexually explicit entertainment outside the home receive intermediate scrutiny if they are not premised on a desire to suppress the content of such entertainment, but rather to address the harmful secondary effects of such entertainment: higher crime rates and lower property values, and unwanted interactions between patrons and entertainers, such as public sexual conduct, sexual assault, and prostitution.

<u>Bason</u>, 303 F.3d at 513.

### b.    <u>Prior Restraint</u>

A law "subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."  <u>Shuttlesworth v. City of Birmingham</u>, 394 U.S.

147, 150-51 (1969). "[O]therwise valid content-neutral time, place, and manner restrictions that require governmental permission prior to engaging in protected speech must be analyzed as prior restraints and are unconstitutional if they do not limit the discretion of the decision maker and provide for the proper procedural safeguards." 11126 Balt. Blvd., Inc. v. Prince George's County, 59 F.3d 988, 995 (4th Cir. 1995).

Before CB-61 is analyzed under the O'Brien content-neutral framework, the licensing scheme must be examined as a prior restraint. Id.; see id. at 997 (noting that the desire of Prince George's County in enacting the licensing ordinance was to "ameliorate the adverse secondary effects of adult bookstores" but still employing the prior restraint analysis of Freedman v. Maryland, 380 U.S. 51, 58-60 (1965). If the licensing scheme meets the Freedman requirements, it is not an unconstitutional prior restraint.

Licensing restrictions on adult businesses will be upheld so long as "(1) any restraint prior to judicial review can be imposed only for a brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." FW/PBS, Inc. v. Dallas, 493 U.S. 215, 227 (1990) (O'Connor, J.) (citing Freedman, 380 U.S. 58-60); Encore Videos, Inc. v. City of San Antonio, 330 F.3d 288, 296-97 (5th Cir. 2003). The review procedure prior to issuance of the

23

license and judicial review of a denial must "cabin the decision-maker's discretion" so as to prevent the censorship of disfavored speech.  <u>Steakhouse</u>, 166 F.3d at 638.  Once the administrative review is completed, the second prong of <u>Freedman</u> requires an aggrieved applicant to have access to a prompt judicial <u>determination</u> of the merits of the claim.  <u>City of Littleton v. Z.J. Gifts D-4, L.L.C.</u>, 541 U.S. 774, 781 (2004); <u>11126 Balt. Blvd.</u>, 59 F.3d at 999-1000.  However, the need for prompt judicial determination may be provided by an appeal of the adverse decision to the state's court system through the usual procedures.  <u>Z.J. Gifts</u>, 541 U.S. at 781-82.  Applying these standards, it is evident that the CB-61 licensing scheme is not an unconstitutional prior restraint.

The determination of the decision-maker[15] is sufficiently limited so as to cause no concern that the ordinance may give rise to arbitrary enforcement or censorship.  An application for an adult entertainment premises license requires only that the applicant provide biographical information and past business information germane to the present issuance of a license to do business.  CB-61, § 5-2605.  The requirement that an applicant submit parking and security plans and a life safety evaluation is not so nebulous as to render the discretion of the Chief of Police unlimited.  Furthermore, so long as the application is complete, the applicant will have a decision within five days.  <u>Id.</u> § 5-2608.

---

[15]   Here, the Chief of Police.

Applicants for a manger's or entertainer's license need only submit proof of age, biographical data, and the list of locations at which the applicant intends to work.  Within five days of such an application, the applicant will have a decision.  While there always exists the possibility that some decision-maker might render arbitrary rulings based on whim and personal proclivities, the ordinance does not grant that power.  In order to stave off abuses, Prince George's County has provided an additional level of administrative review.

Should an application be denied or a license revoked, the adverse action must first be appealed to the Prince George's County Board of Administrative Appeals within ten days.  On November 1, 2006, just a few weeks after CB-61 was to take effect, the Board of Appeals adopted a rule requiring the Board to hear any appeals from license denials under CB-61 within twenty days of receipt of appeal.  After the argument is heard, the Board must, by its own rules, render a decision on manager or entertainer licenses within five days and on adult entertainment premises licenses within ten days.

Assuming an aggrieved applicant appeals as soon as possible, the administrative review will be completed thirty to thirty-five days after the initial application.  This review period is not so long as to render the licensing scheme unconstitutional.  Viewed in light of the Fourth Circuit's affirmation of the propriety of a ninety-day administrative review period in <u>Steakhouse</u>, the present review period certainly satisfies <u>Freedman's</u> first prong.

25

Addressing <u>Freedman's</u> second prong, the judicial review period in CB-61 is directly analogous to that in <u>Z.J. Gifts</u>. 541 U.S. at 777. There, the Colorado town of Littleton passed an ordinance requiring that adult bookstores and adult video stores apply for a license before doing business. <u>Id.</u> A denial of a license could be appealed to the Colorado state courts pursuant to the state rules of civil procedure. <u>Id.</u> Though the ordinance did not provide an accelerated briefing schedule or a time by which the decision had to be rendered, the Supreme Court held that the state's "ordinary judicial review procedures suffice as long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly." <u>Id.</u> at 781-82.

CB-61 allows an appeal of the denial of a license to the Circuit Court for Prince George's County. The appeal is governed by the state rules of procedure. Just as in <u>Z.J. Gifts</u>, "ordinary court procedures [provide] judicial tools sufficient to avoid delay-related First Amendment harm." <u>Id.</u> at 781. Additionally, this Court has every confidence that the Prince George's County Circuit Court judges will "execute [their] powers wisely so as to avoid" such serious threats of harm. <u>Id.</u> In the highly unlikely case that the Circuit Court does not administer its procedures in a constitutional manner, Plaintiffs or other injured parties can mount a case-specific challenge. <u>Id.</u> at 782.

26

3.    Applying the O'Brien Test

Plaintiffs allege that CB-61 is unconstitutional on its face because it includes conduct restrictions and a licensing scheme that blocks the free expression of their erotic dancing. Ordinances that "regulate sexually explicit entertainment outside the home receive intermediate scrutiny if they are not premised on a desire to suppress the content of such entertainment, but rather to address the harmful secondary effects of such entertainment: higher crime rates and lower property values." Bason, 303 F.3d at 513; see also Alameda, 535 U.S. at 434.

So long as it is conceivable that a jurisdiction sought to alleviate secondary effects of sexually oriented conduct, the Court will assume[16] that "one purpose of [the regulation] is to address the secondary effects that follow from lewd conduct on licensed premises, and that hostility to erotic expression, if a purpose of the restrictions at all, does not constitute the predominant purpose." Id. at 515 (emphasis added).

Supreme Court jurisprudence regarding the regulation of adult businesses based on their secondary effects has primarily focused on two types of regulations: public nudity ordinances and zoning ordinances. Carandola I, 396 F. Supp. 2d at 636.

---

[16]    In Bason, North Carolina provided "no record evidence," "submitted no direct evidence of legislative motive," and did not "proffer a single study of secondary effects relied upon by the legislature or the Commission" to support their claim that they enacted the regulations to address secondary effects, "protect 'public decency' and to prevent 'disorderly conduct' and 'blatant bacchanalian revelries.'" 303 F.3d at 514.

Currently, the <u>Renton</u> test is used to examine zoning ordinances[17]
that affect sexually explicit businesses, and the <u>O'Brien</u> test is
employed to analyze public nudity statutes.[18]  <u>Renton</u>, 475 U.S.
at 46-50; <u>Alameda</u>, 535 U.S. at 433-34.  The <u>Renton</u> test asks:

> 1) if the law is a time, place and manner
> regulation, or a total ban,
>
> 2) if a time, place and manner regulation, what is
> the appropriate level of scrutiny, and
>
> 3) if intermediate scrutiny is appropriate, whether
> the law serves a substantial government interest
> and allows for reasonable channels of
> communication.

<u>Renton</u>, 475 U.S. at 46-50; <u>Carandola I</u>, 396 F. Supp. 2d at 636-
37.  The four-part <u>O'Brien</u> test examines whether:

> 1) the government has the constitutional power to
> enact the statute,
>
> 2) the statute furthers an important or substantial
> government interest,
>
> 3) the governmental interest is unrelated to
> suppressing free expression, and
>
> 4) the statute restricts First Amendment freedoms
> no greater than necessary to further the
> government's interest.

<u>Barnes</u>, 501 U.S. at 567 (citing <u>O'Brien</u>, 391 U.S. at 376-77);
<u>Carandola I</u>, 396 F. Supp. 2d at 637.

_____

[17]It should be noted that <u>Renton</u> is used to analyze zoning
ordinances that target adult businesses, not generally applicable
zoning ordinances, such as CB-31. <u>Renton</u>, 475 U.S. at 46.

[18]As well as many other types of laws that affect speech.
<u>See</u>, <u>e.g.</u>, <u>O'Brien</u>, 391 U.S. at 369; <u>Turner Broad. Sys., Inc. v.
FCC</u>, 520 U.S. 180, 185 (1997).

28

Though stated somewhat differently, the two tests are, in practical effect, nearly identical. See Barnes, 501 U.S. at 566 (stating that the Renton inquiry embodies the same standards as O'Brien); Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989) (stating there is little, if any, difference between the two tests); Ben's Bar, Inc. v. Vill. of Somerset, 316 F.3d 702, 714 (7th Cir. 2003) (noting that the Supreme Court's most recent cases make it "abundantly clear that the analytical frameworks and standards utilized by the Court in evaluating adult entertainment regulations, be they zoning ordinances or public indecency statutes, are virtually indistinguishable"); but see Peek-A-Boo Lounge of Bradenton v. Manatee County, 337 F.3d 1251, 1264 (11th Cir. 2003) (concluding that despite the similarities in O'Brien and Renton, zoning and public nudity ordinances "must be distinguished and evaluated separately").

CB-61 is neither a zoning nor a pure public nudity ordinance, but the O'Brien test is used to analyze restrictions on exotic dancing such as those at issue here. See Fantasy Ranch, Inc. v. City of Arlington, 459 F.3d 546, 558 (5th Cir. 2006), Carandola I, 396 F. Supp. 2d at 637.

Though CB-61 has escaped strict scrutiny, the intermediate scrutiny of O'Brien is meaningful, and the County bears the burden of persuasion. Bason, 303 F.3d at 515. Prince George's County must produce evidence that the conduct restrictions and licensing provisions of CB-61 "materially advance an important or substantial interest by redressing past harms or preventing

29

future ones." <u>Satellite Broad. & Commc'ns Ass'n v. FCC</u>, 275 F.3d
337, 356 (4th Cir. 2001).  These harms "must be 'real, not merely
conjectural,' and the regulation must 'alleviate these harms in a
direct and material way.'" <u>Id.</u> (quoting <u>Turner Broad. Sys., Inc.</u>,
512 U.S. at 664).

To survive intermediate scrutiny, CB-61 must further the
County's substantial interest in regulating the secondary effects
associated with the adult entertainment that occur at the adult
entertainment clubs.  <u>O'Brien</u>, 391 U.S. at 376-77; <u>Barnes</u>, 501
U.S. at 567; <u>Renton</u>, 475 U.S. at 47.  Precisely how the County
must demonstrate this substantial interest and the amount of
evidence upon which the County may and must rely is articulated
in the burden-shifting framework of <u>Alameda Books, Inc. v. City
of Los Angeles</u>, 535 U.S. 425 (2002).

In <u>Alameda</u>, the City of Los Angeles enacted an ordinance
that prohibited adult businesses from being located within 1,000
feet of each other or within 50 feet of a religious institution,
school, or public park.  <u>Id.</u> at 430.  Writing for the plurality,
Justice O'Connor stated that the City of Los Angeles did not have
to "prove its theory about a concentration of adult operations
attracting crowds of customers." <u>Id.</u> at 437.  The plurality
reiterated the holding in <u>Renton</u> that "a municipality may rely on
any evidence that is 'reasonably believed to be relevant' for
demonstrating a connection between speech and a substantial,
independent government interest." <u>Id.</u> at 438; <u>Renton</u>, 475 U.S.
at 51-52.  However, this low bar does not grant the municipality

30

carte blanche to rely on "shoddy data or reasoning." Alameda,
535 U.S. at 438. The evidence relied upon by the municipality
"must fairly support [the] rationale for the ordinance." Id.

Once the municipality has produced such evidence, plaintiffs
may then attempt to "cast direct doubt on this rationale, either
by demonstrating that the municipality's evidence does not
support its rationale or by furnishing evidence that disputes the
municipality's factual findings." Id. at 438-39 (emphasis
added). Put another way, plaintiffs can cast doubt on the
municipality's evidence either intrinsically - by undermining the
logical connection between the evidence and the ordinance - or
extrinsically - by presenting additional evidence that calls
validity of the municipality's evidence into question.

If the plaintiffs are unsuccessful in casting doubt on the
government's evidence of secondary effects, then the municipality
has carried its burden under Renton and Alameda, and the inquiry
is over. Id. at 439. However, if plaintiffs "succeed in casting
doubt on a municipality's rationale in either manner, the burden
shifts back to the municipality to supplement the record with
evidence renewing support for a theory that justifies its
ordinance."[19] Id.

_____

[19] The plurality in Alameda held that the plaintiffs had
not cast doubt on the city's evidence, and thus the city carried
its burden. Id. However, it is important to note that the
Alameda reached the Supreme Court on appeal from the grant of
summary judgment, and the plaintiffs' only evidence consisted of
counsel's arguments that the city's main study failed to prove
that the city's justification was necessarily correct. Id.

Although there is no majority opinion in Alameda, Justice
Kennedy's concurrence is the narrowest opinion and thus has been
recognized as controlling.  See Peek-A-Boo Lounge, 337 F.3d at
1264; Ben's Bar, Inc., 316 F.3d at 722; SOB, Inc. v. County of
Benton, 371 F.3d 856, 862 n.1 (8th Cir. 2003); Carandola I, 396
F. Supp. 2d at 638.  Justice Kennedy wrote separately to state
that in addition to asking how much evidence is required to
support the government's position, the proper inquiry asks "what
proposition does a city need to advance in order to sustain a
secondary-effects ordinance?"  Alameda, 535 U.S. at 449 (Kennedy,
J., concurring in judgment).  In Justice Kennedy's view, whatever
proposition the city advances must have "the purpose and effect
of suppressing secondary effects, while leaving the quantity and
accessibility of speech substantially intact."  Id.

The Court must therefore inquire "whether the municipality
can demonstrate a connection between the speech regulated by the
ordinance and the secondary effects that motivated the adoption
of the ordinance."  Ben's Bar, Inc. 316 F.3d at 724.  A
municipality, then, may not justify the suppression of speech
based on the bald assertion that the intent is to regulate
secondary effects.  A connection must be made between the
"negative effects and the regulated speech" through the evidence
produced by the municipality and must survive the burden-shifting
framework.  R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 408
(7th Cir. 2004).  As noted by Justice Kennedy, "the necessary
rationale for applying intermediate scrutiny is the promise that

32

zoning ordinances . . . may reduce costs of secondary effects without substantially reducing speech." <u>Alameda</u>, 535 U.S. at 450.

In specific reference to CB-61, the County must produce evidence that the conduct restrictions and licensing scheme will reduce the secondary effects it identifies, and must do so with evidence that it "reasonably believed to be relevant" and which "fairly supports" its rationale. <u>Id.</u> at 438; <u>see</u> <u>id.</u> at 449. The rationale supported must be that limiting expression will have the "purpose and effect" of reducing the secondary effects identified by the County.

    a.   <u>First Prong - Constitutional Power</u>

The first prong of the O'Brien test requires that it be within the constitutional power of the Government entity to enact the regulation in question. <u>Barnes</u>, 501 U.S. at 567. It is undoubtedly within the power of the government to prevent public indecency and regulate, within constitutional limits, sexually oriented entertainment. <u>Id.</u> Moreover, Plaintiffs have not suggested that CB-61 fails in this respect.

    b.   <u>Second Prong - Secondary Effects</u>

    1.   <u>County Evidence Relied Upon</u>

The "Declaration of Findings and Public Policy" that begins CB-61 states that the ordinance is intended to "mitigate the secondary effects of adult-oriented businesses." CB-61, § 5-

33

2600(1).  Among those secondary effects, the ordinance notes, are "(a) prostitution and other sex related offenses (b) drug use and dealing and (c) health risks through the spread of AIDS and other sexually transmitted diseases."  Id. § 5-2600(3).

At trial, Prince George's County introduced the evidence that had been relied upon by the County Council.  This evidence was of the type that Alameda and its progeny have recognized and may validly be relied upon by municipalities.  See SOB, Inc., 317 F.3d at 862-63; Fantasy Ranch, 459 F.3d at 559.

The Council had before it copies of statutes regulating adult entertainment businesses from other jurisdictions, as well as anecdotal evidence of the deleterious effects of sexually oriented businesses.  Def.'s Ex. 3.  The Council also had before it various updates on legal precedent dealing with the regulation of sexually oriented businesses, and summaries of crime impact studies by municipal and state governments on the harmful secondary effects of sexually oriented businesses.  The Council also had evidence specific to the County, including a list of calls for service and numbers of crimes at specific adult entertainment clubs, as well as statements from Colonel Jeffrey Cox of the County Police Department as to the problems that the County faces in dealing with adult entertainment businesses.

The County introduced at trial thirty-three "studies" from other jurisdictions on the effects of various types of sexually

34

oriented businesses.[20]  Def.'s Ex. 4.  Many of these "foreign
jurisdiction" studies have been relied upon by other
jurisdictions in prior cases.  <u>See</u> <u>Carandola I</u>, 396 F. Supp. 2d
at 643-45 (listing some of the studies relied upon by North
Carolina that were also relied upon by Prince George's County).

The evidence relied on by the County is typical of the
evidentiary support relied upon by other state and municipal
governments in enacting legislation similar to CB-61.  <u>Gammoh v.
City of La Habra</u>, 395 F.3d 1114, 1126 (9th Cir. 2005) (upholding
the reliance by a city on evidence very similar to that relied
upon by Prince George's County); <u>see also</u> <u>G. M. Enterprises, Inc.
v. Town of St. Joseph</u>, 350 F.3d 631, 633-34 (7th Cir. 2003);
<u>Fantasy Ranch,</u> 459 F.3d at 559; <u>Andy's Restaurant & Lounge, Inc.
v. City of Gary</u>, 466, F.3d 550, 555 (7th Cir. 2006); <u>N.W.
Enterprises, Inc. v. Houston</u>, 352 F.3d 162, 175-75 (5th Cir.
2003); <u>Encore Videos</u>, 330 F.3d at 294-96; <u>SOB, Inc.</u>, 317 F.3d at
862-63; <u>but see</u> <u>R.V.S., L.L.C.</u>, 361 F.3d at 411-12 (finding a
city's limited proffer of evidence insufficient to carry its
initial burden under <u>Alameda</u>).

The evidence introduced by the County was sufficient to
carry the initial burden under <u>Alameda</u> and <u>Renton</u>.  The burden
then shifted to Plaintiffs to offer evidence that rebuts the

---

[20]  Though termed "studies," Plaintiffs established that the
different materials cited as "studies" by Defendants varied
greatly in method and statistical significance.  The Court finds
the semantic question of what is a "study" to be insignificant
and thus will simply refer to anything termed as a "study" as
such.

Defendants' evidence either by demonstrating "that the
municipality's evidence does not support its rationale" or by
"disput[ing] the municipality's factual findings." <u>Alameda</u>, 535
U.S. at 438-39.

2.   <u>Plaintiffs' Evidence</u>

Plaintiffs' primary witness was Randy D. Fisher, Ph.D., a
member of the faculty of the Psychology Department of the
University of Central Florida.  He holds a Ph.D. in psychology
from Vanderbilt University and was Director of the Survey
Research Laboratory from 1998 until 2003. He has authored over
500 peer-reviewed articles and has performed fifteen to twenty
reviews of the evidence put forth by municipalities for
restrictions on adult businesses.

Dr. Fisher prepared a report entitled "An Analysis of the
Predicate for CB-61-2006" critiquing the studies and evidence
relied upon by Prince George's County.  In performing his review
of CB-61, Dr. Fisher reviewed the evidence supplied by the
Plaintiffs to the County as well as the evidence submitted by
Defendants as the County's trial record.

It is sufficient for purposes of the instant discussion to
state that the Court finds that Dr. Fisher effectively
demonstrated that the "evidence" relied upon by the County was
manifestly inadequate to validate its secondary effects
conclusion with regard to the conduct restrictions.  Indeed, the
County appears to have gone out of its way to avoid obtaining

36

readily available information that could have been significant in
reaching a secondary effects conclusion with regard to conduct
restrictions.  For example, Wet Sands provides an all-male revue
in which nude dancers perform a few nights a week, but also
operates without adult entertainment on other nights, and even
allows a church to use the premises for services on certain days.
There is no doubt that anyone purporting to have a genuine
interest in secondary effects of adult entertainment should at
least compare the difference between "secondary effects" evidence
at this location on adult entertainment nights and the times when
there is other entertainment and/or church services.

### 3.   County's Trial Evidence

The County presented the testimony of Lewis Gentile
("Gentile"), author of the study of the effects of adult
businesses in Prince George's County on which the County relied
when enacting CB-61.  Gentile has had a long career in state and
federal law enforcement, holds a bachelor's degree in
criminology, a master's degree in public administration, and has
nearly completed his Ph.D. in sociology.  He is currently the
president of Gentile, Meinert and Associates, a consulting firm.

The Gentile study was seriously flawed and was inadequate to
support the County's secondary effects conclusion with regard to
the conduct restrictions in CB-61.  For example, Gentile
acknowledged that "[y]ou can't categorize what I've done as

37

meeting a statistics methodology, rigorous scientific
requirements.  You would categorize it as a survey that has gone
through a process."  Trial Tr. 10-11 (Dec. 20, 2006).  Moreover,
Gentile conceded that some of the businesses in his study do not
even provide adult entertainment.  Gentile also stated that he
had no empirical evidence to support the claim that there was a
secondary effect of an increase in crime.  His conclusion was
supported "exclusively" by previous studies done by others,
remote in place and time from the County of today.

Gentile testified that his conclusion that adult businesses
cause a decrease in property values was based on "interviews with
[some people] within relative close proximity"[21] and the "whole
reasonableness of the issue."  Trial Tr. 11-12.  In sum, as
Gentile himself testified, Dr. Fisher's critique of Gentile's
report was "a fine piece of academic work."  Trial Tr. 23.

Of course, the County "need not conduct local studies or
produce evidence independent of that already demonstrated by
other municipalities to demonstrate the efficacy of its chosen
remedy, 'so long as whatever evidence [the County] relies upon is
reasonably believed to be relevant to <u>the problem it addresses</u>.'"
<u>Peek-A-Boo Lounge</u>, 337 F.3d at 1265 (emphasis added).  However,

---

[21]  Gentile did not identify, and presumably did not know,
where the interviewees lived or what connection, if any, they had
to the vicinity of the business in question.  It appears that all
that was known was that they happened to be in the vicintiy when
interviewed.  Moreover, some of the businesses that Gentile
studied were not even adult entertainment businesses.  The
interview "evidence" is, accordingly, essentially without
probative value.

deference to the County must be balanced with the Court's
"obligation to exercise independent judgment when First Amendment
rights are implicated." <u>Alameda</u>, 535 U.S. at 440 (citing <u>Turner
Broad. Sys., Inc.</u>, 512 U.S. at 666). In accordance with that
balance, this Court must require the County's actions to be
narrowly tailored, such that the ordinance "be drawn to affect
only that category of business <u>shown to produce</u> the unwanted
secondary effects." <u>Peek-A-Boo</u>, 337 F.3d at 1272 (citing <u>Renton</u>,
475 U.S. at 52) (emphasis added).


### 4.    The Conduct Restrictions

The County has not produced any credible evidence that the
conduct restrictions it seeks to impose on adult entertainment
businesses such as Plaintiffs' would reduce the alleged secondary
effects it sought to alleviate, such as drug dealing, the spread
of STDs, and an "atmosphere of deviance." <u>See</u> Trial Tr. 14.
Indeed, there is nothing of any substance to support a conclusion
that the secondary effects alleged by the County (such as rape,
robbery, assault, theft from automobiles, etc.) would be reduced
at all by requiring dancers to perform on an elevated stage,
keeping patrons six feet away from performers, prohibiting tips
during performances, banning any physical contact between patrons
and entertainers, etc.

Accordingly, absent the Savings Clause, the conduct
restrictions in CB-61 would not pass constitutional muster. As
discussed above, however, the Savings Clause restricts the

39

applicability of the conduct restrictions to obscene conduct.
Such conduct is not afforded First Amendment protection.
Accordingly, by virtue of the Savings Clause, the conduct
restrictions in CB-61 are valid and enforceable, but, of course,
only with regard to conduct that is obscene under the <u>Miller</u>
standards.


### 5. The Licensing Scheme

Plaintiffs were not successful in rebutting the evidence of
secondary effects supporting a licensing scheme.  The County
considered evidence establishing that, absent licensing, it is
not feasible to know of all adult entertainment clubs and
impossible to know the identities of operators, employees and
entertainers.  Many of the problems rendering Gentile's study
inadequate to support the County's conclusion regarding conduct
restrictions could be overcome if he (and the County) were able
to know which businesses provided adult entertainment.

The County has adequately demonstrated the secondary effects
caused by an absence of a licensing scheme.  These include the
County's inability to identify the pertinent businesses and
people, the need to ensure adequate security for patrons and
neighborhoods in view of the number of persons attending these
clubs at late hours, and the need to ensure that persons
convicted of certain offenses are not engaged in the business.
Additionally, it is apparent that imposing a licensing scheme
enabling the identification of entertainers and others who

40

generate substantial cash income is likely to have a positive
effect upon the enforcement of the income tax laws.  Most
importantly, Plaintiffs' demonstration of many of the defects in
the County's evidence plainly indicates that a licensing scheme
would substantially assist the County in an effort to obtain
reasonably reliable evidence of the presence or absence of
asserted secondary effects.

Thus, the Court concludes that the licensing scheme
addresses a substantial interest in avoiding the reasonably
perceived secondary effects stemming from the absence of a
licensing scheme.

### 3.   Third Prong - Content Neutral

Under the third prong of the <u>O'Brien</u>, test, the ordinance
must be "justified without reference to the content of the
regulated expression." <u>Barnes</u>, 501 U.S. at 567.  As discussed
above, the County's stated purpose in enacting CB-61 was to
combat secondary effects of adult entertainment.  In view of that
stated purpose, combined with the Fourth Circuit's assumption of
that intent by the North Carolina legislature in <u>Bason</u>, the
licensing scheme in CB-61 can be justified by the County's intent
to regulate harmful secondary effects.  <u>See Bason</u>, 303 F.3d at
515 (presuming, though no evidence was offered on the point, that
the North Carolina legislature intended to address the secondary
effects of nude dancing).

41

d.    Fourth Prong - Unrelated to Suppression

Once a substantial interest is found that is unrelated to the suppression of free speech, <u>O'Brien</u> requires that "any incidental restriction on alleged First Amendment freedoms be no greater than is essential to further the government's interest." <u>O'Brien</u>, 391 U.S. at 376.  The County is not required to choose the "least restrictive means" of serving the substantial interest, but it may not "burden substantially more speech than is necessary to further the government's legitimate interests." <u>Id.</u>  The County may not "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."  <u>Id.</u>

The Court concludes that the existence of a licensing scheme in CB-61 is justified by the County's interest in preventing the above-described secondary effects resulting from totally unlicenced adult entertainment businesses of the type operated by Plaintiffs.  The Court finds that except with regard to public posting of licenses identifying licensed individuals, the licensing scheme is no greater than is essential to justify the County's legitimate governmental interest.

The ordinance provides that entertainers' licenses shall be posted so as to be readily available for inspection by County authorities (§ 5-2610) and managers' licenses "in a conspicuous place and manner."  <u>Id.</u> at § 5-2610(b).  The ordinance is ambiguous as to whether there must be a posting of licenses in a manner that discloses the name and address of individual

42

licensees to members of the public.  The Court finds no justification for the posting of licenses in a manner to make public the names and/or addresses of individual licensees.

Thus, consistent with Judge Chasanow's preliminary injunction, the Court will enjoin enforcement of a requirement requiring the posting of licenses in a manner that would make the names and addresses of licensed individuals visible to members of the public.  On the other hand, the County might be able to adopt a public posting requirement that preserved the privacy of the names and addressees of individual licensees;[22] the posting provision could thus be adequately tailored to be valid and enforceable.  Or, there presumably could be a requirement that licenses need not be posted but had to be readily accessible for inspection by authorized governmental personnel.

III. CONCLUSION

For the foregoing reasons, the Court decides that:

1.    Prince George's County Ordinance CB-31-2006 is facially valid and enforceable.

2.    The provisions of Prince George's County Ordinance CB-61-2006, §§ 5-2609(a)(8), 5-2609(b)-(d) and 5-2613 are facially valid and enforceable.

3.    The hours of operation provision in § 5-2612 is facially valid and enforceable to the extent that it imposes on adult entertainment businesses the

---

[22]    For example, it may be feasible to provide that there be public posting of licenses identifying individual licensees by an assigned number, with management required to have available for inspection by appropriate government personnel the identity and address of each such licensee.

same restrictions as applicable to businesses that are licensed to serve alcoholic beverages.

4.    The sign posting provisions of Prince George's County Ordinance CB-61-2006, § 5-2609(a)(11) are facially valid and enforceable but only with regard to the display of a sign stating that the premises are licensed and that entertainers are not permitted to engage in any type of sexual conduct.

5.    The provisions of Prince George's County Ordinance CB-61-2006, §§ 5-2609(a)(1)-(7), and (a)(9)-(10) are facially valid and enforceable with respect to conduct that is "obscene" but not as to conduct that is not "obscene."

6.    The provisions of Prince George's County Ordinance CB-61-2006, §§ 5-2602 - 5-2608, 5-2611 and 5-2614 - 5-2616 are facially valid and enforceable.

7.    The provisions of Prince George's County Ordinance CB-61-2006, § 5-2610 are facially valid and enforceable except as to the requirement for any public display of licenses disclosing the names and/or addresses of individual licensees.

8.    By separate Orders the Court shall issue Permanent Injunctions and Judgments consistent herewith.


SO DECIDED, on <u>Thursday, April 12, 2007</u>.



—————— / s / ——————
Marvin J. Garbis
United States District Judge

44

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CLOUMBIA

| | |
|---|---|
| **MYSTERY PRODUCTIONS** **ENTERTAINMENT, LLC,** **T/A CLUB RENDEZOUS** : | |
| Plaintiff, : | Case No.: HHK-07-00707 |
| v. : | |
| **DISTRICT OF COLUMBIA** **GOVERNMENT** : | |
| Defendant. : | |

## <u>ORDER</u>

Upon consideration of Defendant's Motion to Dismiss, or in the Alternative, for

Summary Judgment, Plaintiff's Opposition thereto, and in the interest of justice, it is, this

_____ day of _____, 2007, hereby

**ORDERED** that Defendant's Motion to Dismiss, or in the Alternative, for

Summary Judgment is hereby **DENIED**.


_____
United States District Court Judge


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image